## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RYAN OLOHAN,<br><br>             Plaintiff,<br><br>   -against-<br><br>GOOGLE LLC and TIFFANY MILLER, individually,<br><br>             Defendants. | **CASE NO. 1:22-CV-10163**<br><br>**PLAINTIFF'S RESPONSE TO DEFENDANT GOOGLE LLC'S STATEMENT OF UNDISPUTED MATERIAL FACTS AND COUNTERSTATEMENT OF MATERIAL FACTS** |

Pursuant to Local Civil Rule 56.1, and in support of its motion for summary judgment on plaintiff Ryan Olohan's ("Plaintiff's") claims, defendant Google LLC, by and through its undersigned counsel, hereby submits this statement of undisputed material facts.

### *Google's Policies*

1.      Google maintains an anti-discrimination and harassment policy that prohibits discrimination based on race, sex, or any other basis protected by law (the "Anti-Discrimination Policy"). [Declaration of Sara B. Tomezsko ("Tomezsko Decl.") ¶ 8, Exh. 7 at GOOG-OLOHAN-00000292; Tomezsko Decl. ¶ 1, Exh. 1 ("Olohan Dep.") at 21:11 – 22:3.]

**Response**: Admit.

2.      Under Obligations as a Manager, the Anti-Discrimination Policy states that managers are responsible to "create, uphold, and promote a safe, inclusive workspace that is free of harassment, discrimination, misconduct, abusive conduct and retaliation." [Tomezsko Decl. ¶ 8, Exh. 7 at GOOG-OLOHAN-00000294.]

**Response**: Admit.

3.      Employee Relations ("ER") is responsible for investigating alleged violations of

Google's policies against harassment, discrimination, and retaliation. [Tomezsko Decl. ¶ 8, Exh. 7 at GOOG-OLOHAN-00000295.]

**Response**: Admit.

4.      If investigators recommend disciplinary action at the conclusion of the investigation, that recommendation is calibrated against similar cases to ensure consistency, objectivity, and fairness. [Tomezsko Decl. ¶ 4, Exh. 3 ("Alvarez Dep.") at 52:4 – 53:1.]

**Response**: Denied, as in Olohan's case the recommendation was not, with respect to the alleged alcohol policy violation, calibrated with other instances of far more excessive drinking at Google, including that Stewart served shots of alcohol at his offsites, resulting in an employee becoming ill and vomiting (Olohan Dep. 279:5-8; 280:22 – 281:3), two employees became visibly intoxicated at the offsite, one was unable to speak clearly and the other was having a hard time walking (Stewart Dep. 169:16-18; ███████ Dep. 36:6-21), Stewart was responsible for alcohol consumption at his offsites but faced no discipline (Stewart Dep. 170:15-25), shots of alcohol are served at Google's holiday parties (Stewart Dep. 183:21-24), most Google events did not have an alcohol limit (███████ Dep. 23:6-12), there was always one or two CG&E members who drank too much at offsites (███████ Dep. 25:10-25), and the amount of alcohol served at Olohan's offsite was not excessive (Giuliano Dep. 15:22 – 16:1; Rissmiller Decl. Ex. F (GOOG-OLOHAN-00000628). With respect to the alleged non-inclusivity of the event, Schiestel knew about offsite and lodging arrangements at least five days ahead of time (Schiestel Dep. 28:11-17; 32:12-18), confirmed that the planning of the event was inclusive in advance of it happening and then was no longer concerned about the lodging arrangements (Schiestel Dep. 30:2-7; 34:13-16), attendees had the option of where to stay and women attendees were fine with options but were "happier staying in a hotel with their own bathroom" (Schiestel Dep. 33:11-19), and Schiestel would have taken action in her HR role if lodging was not inclusive but did not because she

did not think sleeping arrangements violated any policies (Schiestel Dep. 36:9-15; 37:5-8).

5.      Human Resources ("HR") or managers typically handle or investigate most other concerns, such as interpersonal conflicts or challenges to performance ratings. [Tomezsko Decl. ¶ 8, Exh. 7 at GOOG-OLOHAN-00000295.]

**Response**: Admit.

6.      The Anti-Discrimination Policy strictly prohibits retaliation against those who raise good-faith concerns or participate in investigations. [Tomezsko Decl. ¶ 8, Exh. 7 at GOOG-OLOHAN-00000293, 296.]

**Response**: Admit.

7.      HR is trained to (and does) escalate potential violations of the Anti-Discrimination Policy for investigation to ER. [Declaration of Jacky Schiestel ("Schiestel Decl.") ¶ 5.]

**Response**: Denied insofar as the statement asserts that "HR … does escalate potential violations." Olohan raised violations of the policy to HR, which HR did not escalate. Olohan Dep. 196:15 – 198:4; 200:22 – 202:5; 205:22 – 206:16; 207:6-12; 214:16 – 215:15; 225:10-14; Olohan Decl. ¶ 11.

8.      Managers receive annual training on the Anti-Discrimination Policy, which covers a manager's role in creating and managing an inclusive workplace. [Schiestel Decl., ¶¶ 7–8, Exh. 1 at GOOG-OLOHAN-00001662, 1666, 1667, 1668, 1687, 1688; Olohan Dep. at 22:16 – 25, 23:24 – 24:9.]

**Response**: Admit.

9.      Plaintiff completed annual or bi-annual training on the Anti-Discrimination Policy. [Olohan Dep. at 22:16 – 25:24.]

**Response**: Admit.

10.     Olohan testified that it is important for managers to create and manage an inclusive workplace. [Olohan Dep. at 25:25 – 26:25.]

**Response**: Admit.

11.     Olohan testified that the expectation and opportunities to promote and manage an inclusive workplace increase as a manager becomes more senior within Google. [Olohan Dep. at 27:2 – 6.]

**Response**: Admit.

12.     Plaintiff was familiar with the Anti-Discrimination Policy during his employment with Google, and reviewed it from time to time. [Olohan Dep. at 21:13 – 22:10.]

**Response**: Admit.

13.     Plaintiff considered the Anti-Discrimination Policy to be among the policies and guidelines he agreed to abide by when he signed his various employment agreements with Google. [Olohan Dep. at 21:13 – 22:15.]

**Response**: Admit.

14.     Google maintains an alcohol use, smoking, and drugs policy that prohibits excessive alcohol consumption while at work, performing Google business, or attending a Google-related event, whether onsite or offsite (the "Alcohol Policy"). [Schiestel Decl. ¶ 13, Exh. 3 at GOOG-OLOHAN-00000286.]

**Response**: Admit.

15.     Per the Alcohol Policy, managers are "expected to ensure teams are aware that excessive drinking is not permitted and to avoid encouraging overconsumption, as well as to address inappropriate conduct that violates [company] policies." [Schiestel Decl. ¶ 13, Exh. 3 at GOOG-OLOHAN-0000286.]

4

**Response**: Admit.

16.    Plaintiff was aware that Google maintained an Alcohol Policy during his employment, and he agreed to abide by the policy when he signed his various employment agreements. [Olohan Dep. at 27:8 – 28:19.]

**Response**: Admit.

17.    Google's Managing By Example training cautions managers to "avoid excessive substance consumption when socializing with your teams," and reminds managers that they are "responsible for ensuring that company-sponsored events, whether onsite or offsite, are safe." [Schiestel Decl. ¶ 8, Exh. 1 at GOOG-OLOHAN-00001688.]

**Response**: Admit.

18.    Olohan completed Managing By Example training in 2021 and 2022. [Schiestel Decl. ¶ 10, Exh. 2 at GOOG-OLOHAN-00000802.]

**Response**: Admit.

*Plaintiff's Employment History*

19.    Google hired Plaintiff in 2007 as a Level 5 Account Executive in the sales organization. [Olohan Dep. at 12:24 – 13:7.]

**Response**: Admit.

20.    Plaintiff received promotions to higher Level roles within the sales organization in or around 2008 (Level 6); 2010 (Level 7); 2013 (Level 8); and 2017 (Level 9). [Olohan Dep. at 16:7 – 17:8; 28:24 – 29:14; 30:2 – 14; 31:3 – 19.]

**Response**: Admit.

*The 2013 Complaints*

21.    In 2013, Employee Relations received a complaint that Plaintiff had engaged in alleged

gender discrimination and pregnancy discrimination. [Olohan Dep. at 250:22 – 24; Tomezsko Decl. ¶ 9, Exh. 8 at GOOG-OLOHAN-00004458 – GOOG-OLOHAN-00004462.]

**Response**: Admit.

22.    Among other things, the complainant (who was 20 weeks pregnant) alleged that Plaintiff expressed a preference for employees who were fast walkers, and those who could work long hours because they did not have spouses or children. [Tomezsko Decl. ¶ 9, Exh. 8 at GOOG-OLOHAN-00004460.]

**Response**: Denied, as the statement that "the complainant … alleged that Plaintiff expressed a preference for employees … who could work long hours because they did not have spouses or children" is not supported by the document cited nor any other evidence Plaintiff is aware of.

23.    The complainant expressed concern about a potential hostile reaction from Plaintiff, who she alleged made repeated comments to the effect of "if you punch me in the face, I will punch you in the face." [Tomezsko Decl. ¶ 9, Exh. 8 at GOOG-OLOHAN-00004459.]

**Response**: Admit.

24.    Grace Rewak and Kitt Schute in Employee Relations investigated the 2013 Complaint. [Tomezsko Decl. ¶ 9, Exh. 8 at GOOG-OLOHAN-00004458; Tomezsko Decl. ¶ 10, Exh. 9 at GOOG-OLOHAN-00004498; Olohan Dep. at 251:16 – 252:3.]

**Response**: Admit.

25.    ER concluded that Olohan had made some of the complained-of comments attributed to him, but did not find that the comments were improperly motivated by discriminatory animus. [Tomezsko Decl. ¶ 10, Exh. 9 at GOOG-OLOHAN-00004498.]

**Response**: Admit.

26.    ER concluded that Olohan demonstrated poor judgment in that the comments attributed

6

to him were inconsistent with the level of professionalism Google expects from its managers. [Tomezsko Decl. ¶ 10, Exh. 9 at GOOG-OLOHAN-00004498; Olohan Dep. at 252:14 – 253:2.]

**Response**: Denied, as the document cited shows that the statement referred to is qualified by "may have demonstrated …" as opposed to the definitive conclusion referred to in the statement. Tomezsko Decl. ¶ 10, Exh. 9 at GOOG-OLOHAN-00004498.

27.    Following the investigation into the 2013 complaint, Olohan was required to take training on the Anti-Discrimination policy. [Tomezsko Decl. ¶ 10, Exh. 9 at GOOG-OLOHAN-00004498; Olohan Dep. at 253:3 – 6.]

**Response**: Admit.

28.    Olohan completed the required training. [Olohan Dep. at 253:7 – 8.]

**Response**: Admit.

29.    Olohan does not recall doing anything to change his behavior after ER concluded he demonstrated poor judgment and made comments inconsistent with the level of professionalism Google expects of its managers. [Olohan Dep. at 253:20 – 254:13.]

**Response**: Denied that ER concluded that Olohan demonstrated poor judgment. ER did not conclude what is alleged in this paragraph, but rather the possibility that it may have occurred: "may have demonstrated …" Tomezsko Decl. ¶ 10, Exh. 9 at GOOG-OLOHAN-00004498.

*The 2014 Complaint*

30.    In 2014, a different employee on Olohan's team complained to HR that two men had entered her hotel room one night during a team offsite event. [Declaration of Cecilia Alvarez ("Alvarez Decl.") ¶ 7, Exh. 1 at GOOG-OLOHAN-00002738.]

**Response**: Admit.

31.    The complainant alleged that during the offsite, Olohan told her that the two men

appeared interested in her, and gave the men her jacket and/or email address, which they used to contact the complainant that evening and get into her room. [Alvarez Decl. ¶ 7, Exh. 1 at GOOG-OLOHAN-00002738 – GOOG-OLOHAN-00002739.]

**Response**: Admit, except deny the portion of the statement that "[t]he complainant alleged that during the offsite, Olohan … gave the men her jacket and/or email address, which they used to … <u>get into her room</u>," which is not supported by the document cited nor any other evidence Plaintiff is aware of. Rather, the document alleges that Olohan providing the men her jacket and/or email address was solely used to email the complainant. Alvarez Decl. ¶ 7, Exh. 1 at GOOG-OLOHAN-00002739.

32.     ER investigators Schute and Danielle Corona reviewed these allegations. [Alvarez Decl. ¶ 7, Exh. 1 at GOOG-OLOHAN-00002738.]

**Response**: Admit.

33.     Olohan was interviewed in connection with ER's investigation into this complaint. [Alvarez Decl. ¶ 7, Exh. 1 at GOOG-OLOHAN-00002738.]

**Response**: Admit.

34.     According to ER's investigation report, Olohan admitted to telling the complainant the two men appeared interested in her. [Alvarez Decl. ¶ 7, Exh. 1 at GOOG-OLOHAN-00002740.]

**Response**: Denied, as the report cited alleges that Olohan "stated that he commented to that they may have been interested, <u>but in such a way that indicated she should be aware of the situation and watch out</u> …" Alvarez Decl. ¶ 7, Exh. 1 at GOOG-OLOHAN-00002740.

35.     ER did not conclude that Olohan facilitated the men's entry into the complainant's hotel room or violated any policies due to lack of information. [Alvarez Decl. ¶ 7, Exh. 1 at GOOG-OLOHAN-00002741.]

**Response**: Admit.

8

36.     At the conclusion of the investigation, ER coached Olohan on his responsibility as a Director to take appropriate action in preventing such incidents moving forward. [Alvarez Decl. ¶ 7, Exh. 1 at GOOG-OLOHAN-00002741.]

**Response**: Admit.

37.     ER also coached Olohan to be aware of his surroundings, especially when drinking is involved, and not allow non-employees at Google-sponsored events. [Alvarez Decl. ¶ 7, Exh. 1 at GOOG-OLOHAN-00002741; Olohan Dep. at 256:17 – 22.]

**Response**: Admit.

*The 2015 HR Review of Employee Feedback*

38.     In early 2015, HR conducted a separate review of comments about Olohan in response to Googlegeist, an annual employee survey. [Alvarez Decl. ¶ 9, Exh. 2 at GOOG-OLOHAN-00002753.]

**Response**: Admit.

39.     One such comment included the following feedback from an employee in 2013: "I have also personally feel [*sic*] that on some level sexism is still ok in the sales org. I've seen specific examples of our director favoring the opinions of men over those of my female colleagues. He acknowledges men more often in meetings, and often puts pressure on colleagues to stay out late and party more in order not to be a 'loser'; in one case, when one of my female colleagues went to leave a happy hour she was told 'don't be such a woman.' It's unprofessional for management to imply that my gender is a negative thing, and it creates an uncomfortable work environment." [Alvarez Decl. ¶ 9, Exh. 2 at GOOG-OLOHAN-00002753.]

**Response**: Admit.

40.     Another such comment included the following feedback from an employee in 2014:

"Ryan Olohan creates a culture of fear where people are afraid to speak their mind. The way people get ahead is to compliment him. He talks behind people's backs and generally does not respect women." [Alvarez Decl. ¶ 9, Exh. 2 at GOOG-OLOHAN-00002753.]

**Response**: Admit.

41.     As a result of the review, HR concluded there was a perception in Olohan's organization that he displayed favoritism towards those with an aggressive style similar to his own. [Alvarez Decl. ¶ 9, Exh. 2 at GOOG-OLOHAN-00002753.]

**Response**: Admit.

42.     As a result of the review, HR concluded that Olohan sometimes made careless remarks or jokes that did not land well. [Alvarez Decl. ¶ 9, Exh. 2 at GOOG-OLOHAN-00002753.]

**Response**: Admit.

43.     At the conclusion of the review, HR and Olohan's management team gave him feedback and coaching. [Alvarez Decl. ¶ 9, Exh. 2 at GOOG-OLOHAN-00002754.]

**Response**: Admit.

44.     At the conclusion of the review, Olohan was also provided one-on-one executive coaching. [Alvarez Decl. ¶ 9, Exh. 2 at GOOG-OLOHAN-00002754.]

**Response**: Admit.

*The 2017 Complaint*

45.     In late 2017, another employee reported to ER that Olohan engaged in alleged gender, age, and race discrimination and made inappropriate comments. [Alvarez Decl. ¶ 9, Exh. 2 at GOOG-OLOHAN-00002752, GOOG-OLOHAN-00002754; Olohan Dep. at 257:19 – 23.]

**Response**: Admit.

46.     Keeley Weir (now Hynes) in ER investigated the complaint. [Alvarez Decl. ¶ 9, Exh. 2

at GOOG-OLOHAN-00002752.]

**Response**: Admit.

47.     The complainant alleged, among other things, that Olohan told her to "walk faster, have more urgency," which the complainant felt was directly related to her age. [Alvarez Decl. ¶ 9, Exh. 2 at GOOG-OLOHAN-00002754.]

**Response**: Admit.

48.     Olohan was interviewed in connection with the investigation into the 2017 complaint. [Alvarez Decl. ¶ 9, Exh. 2 at GOOG-OLOHAN-00002755.]

**Response**: Admit.

49.     According to ER's investigation report, Olohan admitted to telling people of all ages to have more urgency. [Alvarez Decl. ¶ 9, Exh. 2 at GOOG-OLOHAN-00002755.]

**Response**: Admit.

50.     Although ER did not find that Olohan treated employees differently based on their age, race, or gender, ER did conclude that there was a perception that Olohan prefers a certain style or type of individual (i.e., aggressive, outspoken, and high-energy) and that those who have a different style (i.e., quiet, thoughtful, and analytical) have to work harder to prove themselves to him. [Alvarez Decl. ¶ 9, Exh. 2 at GOOG-OLOHAN-00002755.]

**Response**: Admit.

51.     The complainant also alleged that Olohan had in the past made inappropriate and offensive comments of a lewd or sexual nature. [Alvarez Decl. ¶ 9, Exh. 2 at GOOG-OLOHAN-00002755.]

**Response**: Admit.

52.     ER corroborated that Olohan participated in a game of "F*ck, Kill, Marry" at an offsite

11

in or around 2014 or 2015. [Alvarez Decl. ¶ 9, Exh. 2 at GOOG-OLOHAN-00002755.]

**Response**: Denied that Olohan participated or that ER corroborated his participation as Olohan denied participating, explaining to ER that "he is hypersensitive to anything that could be deemed offensive, and is very careful not to joke about sex or physical appearance," and ER only "received feedback to suggest that he most likely was [the initiator]." Alvarez Decl. ¶ 9, Exh. 2 at GOOG-OLOHAN-00002755-2756.

53.    ER also found it more likely than not that Olohan told the complainant about a conversation he had engaged in regarding how much you'd have to pay someone to sleep with female board member(s). [Alvarez Decl. ¶ 9, Exh. 2 at GOOG-OLOHAN-00002755.]

**Response**: Admit.

54.    The complainant also alleged that Olohan made jokes about or references to acts of violence. [Alvarez Decl. ¶ 9, Exh. 2 at GOOG-OLOHAN-00002757.]

**Response**: Admit.

55.    ER concluded that in one instance, Olohan was visibly unhappy with an employee's presentation and that he indicated he wanted to "punch that guy in the face" (in reference to the employee) to other employees and, potentially, within earshot of clients, making more than one employee feel uncomfortable. [Alvarez Decl. ¶ 9, Exh. 2 at GOOG-OLOHAN-00002757.]

**Response**: Admit.

56.    During the investigation, ER received feedback from interviewees that Olohan had "favorites" and/or was harder on certain individuals. [Alvarez Decl. ¶ 9, Exh. 2 at GOOG-OLOHAN-00002755.]

**Response**: Admit.

57.    During the investigation, ER received feedback that Olohan created a "fraternity type of

vibe" where he is always encouraging people to stay out late and keep drinking, and some members of

the team may have felt pressured to engage even when they did not want to. [Alvarez Decl. ¶ 9, Exh. 2

at GOOG-OLOHAN-00002757.]

> **Response**: Admit.

58.     At the conclusion of the investigation, ER concluded that Olohan's conduct violated

Google policy. [Alvarez Decl. ¶ 9, Exh. 2 at GOOG-OLOHAN-00002758 – GOOG-OLOHAN-

00002759.]

> **Response**: Admit.

59.     Because some of Olohan's complained-of conduct had been the subject of previous

investigations and feedback, ER recommended Olohan receive either a Written Warning or a Final

Written Warning ("FWW"), and that Olohan complete training on the Anti-Discrimination Policy.

[Alvarez Decl. ¶ 9, Exh. 2 at GOOG-OLOHAN-00002759.]

> **Response**: Admit.

60.     Olohan's manager, Jim Lecinski, decided to issue Olohan a FWW. [Alvarez Decl. ¶ 9,

Exh. 2 at GOOG-OLOHAN-00002752; Tomezsko Decl. ¶11, Exh. 10 at GOOG-OLOHAN-0000085;

Olohan Dep. at 264:3 – 9, 70:14 – 24 (Lecinski was his manager in 2018).]

> **Response**: Admit.

61.     According to Google's records, Lecinski identifies as a white man, like Plaintiff.

[Schiestel Decl. ¶ 31.]

> **Response**: Admit.

62.     Lecinski commented in ER's report concluding the investigation into the 2017

complaint on his rationale for issuing Olohan a FWW, writing, "[I]t is now time to be crystal clear that

such behavior is not tolerated here since (1) these behaviors have been appearing regularly over the

course of 4 years, and (2) coaching, training, and discussions have been done previously, seemingly with little/no effect." [Alvarez Decl. ¶ 9, Exh. 2 at GOOG-OLOHAN-00002759.]

**Response**: Admit.

63. Other than the fact that ER investigator Weir reached a conclusion Olohan disagreed with, Olohan has no basis to believe the investigator was biased against men or white people. [Olohan Dep. at 263:3 – 7.]

**Response**: Admit.

64. Olohan testified that he finds the fact that he received a FWW in early 2018 as a result of this investigation "funny." [Olohan Dep. at 263:8 – 21.]

**Response**: Denied, as Olohan testified that he found receiving a warning as a result of saying "I like fast walkers" funny, not that he found receiving a FWW funny. Olohan Dep. 263:16-21.

65. Olohan was aware that an additional infraction or violation of Google policy following his FWW could result in his termination. [Olohan Dep. at 264:23 – 265:5.]

**Response**: Admit.

*Plaintiff and Defendant Miller Join Adam Stewart's Team in 2019*

66. In October 2019, Adam Stewart hired Olohan onto his team to lead the Food, Beverage, and Restaurants (or FBR) vertical. [Olohan Dep. at 31:20 – 32:18.]

**Response**: Admit.

67. Adam Stewart was at the time and continues to be the Vice President of Consumer Goods, Government & Entertainment sector (or CG&E) of Google's sales organization. [Stewart Dep. 20:14 – 21:21.]

**Response**: Admit.

68. According to Google's records, Stewart identifies as a white male. [Schiestel Decl. ¶

30.]

  **Response**: Admit.

  69. Olohan held a Level 9 Managing Director role when Stewart hired him onto his team. [Olohan Dep. 31:20 – 32:18.]

  **Response**: Admit.

  70. As a Managing Director and Level 9 employee, Olohan was responsible for driving the culture of his team and setting an example through his leadership. [Olohan Dep. at 36:8 – 14.]

  **Response**: Admit.

  71. While he reported to Stewart, Stewart was responsible for assigning Plaintiff a performance rating. [Olohan Dep. at 68:5 – 15.]

  **Response**: Admit.

  72. While he reported to Stewart, Stewart was responsible for setting Olohan's compensation. [Olohan Dep. at 75:15 – 77:11.]

  **Response**: Admit.

  73. In or around August 2019, Stewart hired Tiffany Miller to work on a different team within his CG&E organization. [Miller Dep. at 10:6 – 11:23; 299:24 – 300:8.]

  **Response**: Admit.

  74. At the time, Miller held a Level 7 role in the sales organization. [Declaration of Tiffany Miller ("Miller Decl.") ¶ 3.]

  **Response**: Admit.

  75. Miller was promoted to a Level 8 role in or around November 2020. [Miller Decl. ¶ 3.]

  **Response**: Admit.

  76. Miller continues to hold a Level 8 role as of the date of this filing. [Miller Decl. ¶ 1.]

**Response**: Admit.

77.     At all times relevant to the Amended Complaint, Olohan held a higher Level position than Miller. [Olohan Dep. at 149:23 – 150:8; 313:19 – 24.]

**Response**: Admit.

78.     At all times relevant to the Amended Complaint, Miller has no ability or authority to alter the terms and conditions of Plaintiff's employment. [Miller Decl. ¶ 5.]

**Response**: Denied, as Miller had "channels to [A]dam [Stewart]," which she used to try to get Stewart "to not hire [Olohan]." Rissmiller Decl. Ex. G (GOOG-OLOHAN-00003964). Stewart communicated with Miller on a weekly basis. Stewart Dep. 187:24 – 188:5. Miller routinely retaliated against employees who raised complaints about her (Kenyon Dep. 55:21-25; 98:15 – 99:14; 101:13-18; 154:2-18; 159:19-25, Kenyon Affidavit ¶ 10, Rissmiller Decl. Exs. M, R, Olohan Decl. ¶ 24). Further, members of Olohan's team told him that Miller was behind the complaints that led to the termination. Olohan Dep. 301:7 – 303:3; 305:18-25; 313:4-13.

79.     At all times relevant to the Amended Complaint, Miller had no ability or authority to set or change Olohan's compensation. [Olohan Dep. at 149:6 – 19.]

**Response**: Admit.

80.     At all times relevant to the Amended Complaint, Miller had no ability or authority to assign Olohan a performance rating. [Olohan Dep. at 149:6 – 22.]

**Response**: Admit.

81.     At all times relevant to the Amended Complaint, Miller has no ability or authority to assign work to Olohan. [Miller Decl. ¶ 6.]

**Response**: Admit.

82.     At all times relevant to the Amended Complaint, Miller had no ability or authority to

promote Olohan. [Miller Decl. ¶ 7.]

**Response**: Admit.

83.    At all times relevant to the Amended Complaint, Miller has no ability or authority to terminate Plaintiff's employment. [Miller Decl. ¶ 9.]

**Response**: Denied, as Miller had "channels to [A]dam [Stewart]," which she used to try to get Stewart "to not hire [Olohan]." Rissmiller Decl. Ex. G (GOOG-OLOHAN-00003964). Stewart communicated with Miller on a weekly basis. Stewart Dep. 187:24 – 188:5. Miller routinely retaliated against employees who raised complaints about her (Kenyon Dep. 55:21-25; 98:15 – 99:14; 101:13-18; 154:2-18; 159:19-25, Kenyon Affidavit ¶ 10, Rissmiller Decl. Exs. M, R, Olohan Decl. ¶ 24). Further, members of Olohan's team told him that Miller was behind the complaints that led to the termination. Olohan Dep. 301:7 – 303:3; 305:18-25; 313:4-13.

84.    While he reported to Stewart, Olohan was responsible for assigning an initial performance rating to his direct reports. [Schiestel Decl. ¶ 19.]

**Response**: Admit.

85.    In July 2022, Olohan offered one of his direct reports, ▮▮▮▮▮▮▮ the option to take severance and leave Google, or to go on a performance improvement plan. [Tomezsko Decl. ¶ 12, Exh. 11 at GOOG-OLOHAN-00005415.]

**Response**: Admit.

86.    The allegation at paragraph 64 of the Amended Complaint refers to Olohan's termination of ▮▮▮▮ employment, and the decision to retain ▮▮▮▮▮▮▮ [Olohan Dep. at 125:13 – 127:2.]

**Response**: Admit.

87.    Olohan testified that ▮▮▮▮ was one of his team's lowest performers. [Olohan Dep. at

127:18 – 128:14.]

**<u>Response</u>**: Admit.

88.     Olohan testified, "I think ████ was at Google 20 years. I think he slowed down."
[Olohan Dep. at 128:24 – 129:15.]

**<u>Response</u>**: Admit.

89.     Olohan was the person who put ████ on a performance improvement plan in 2022.
[Olohan Dep. at 128:24 – 130:2.]

**<u>Response</u>**: Admit.

90.     When Olohan joined Stewart's team in 2019, ████ was already on a prior
performance improvement plan, and Olohan took over management of that plan. [Olohan Dep. at
128:24 – 129:15.]

**<u>Response</u>**: Admit.

91.     ████ was not on a performance improvement plan in 2022. [Olohan Dep. at 128:17 –
23.]

**<u>Response</u>**: Admit.

92.     Olohan would have been the person responsible for putting ████ on a performance
improvement plan. [Olohan Dep. at 130:7 – 11.]

**<u>Response</u>**: Admit.

93.     In the first quarter of 2022, Olohan assigned ████ a performance rating of Needs
Improvement. [Schiestel Decl. ¶ 20.]

**<u>Response</u>**: Admit.

94.     In the first quarter of 2022, Olohan assigned ████ a higher performance rating of
Consistently Meets Expectations. [Schiestel Decl. ¶ 20.]

**Response**: Admit.

*Olohan Was Treated Well While on Stewart's Team*

95.     Stewart awarded Olohan compensation increases annually while Olohan reported to him. [Olohan Dep. at 51:3 – 11; 69:25 – 3; 75:9 – 77:11.]

**Response**: Admit.

96.     Stewart consistently assigned Olohan performance rating of Exceeds Expectations (3/5) each performance cycle while Olohan reported to him. [Schiestel Decl. ¶ 18.]

**Response**: Admit.

97.     In March 2022, Stewart advocated that Olohan be promoted to a Vice President-level position, by sending him the opening for a Vice President-level role and supporting his application. [Tomezsko Decl. ¶ 13, Exh. 12 at GOOG-OLOHAN-00005223.]

**Response**: Admit.

98.     Jacky Schiestel is the Senior People Partner who supported Stewart's organization from July 2020 through the date of Olohan's termination. [Schiestel Decl. ¶¶ 1, 4.]

**Response**: Admit.

99.     Schiestel also supported Olohan's candidacy for the Vice-President level position in April 2022. [Tomezsko Decl. ¶ 14, Exh. 13 at GOOG-OLOHAN-00004638 – GOOG-OLOHAN-00004639; Schiestel Dep. at 26:11 – 22.]

**Response**: Admit.

100.    Although Olohan ultimately was not offered the Vice-President level position in 2022, he does not believe his gender was a factor in that decision. [Olohan Dep. at 59:11 – 61:5.]

**Response**: Admit.

101.    Although Olohan ultimately was not offered the Vice-President level position in 2022,

he does not believe his race was a factor in that decision. [Olohan Dep. at 61:6 – 17.]

**Response**: Admit.

102.    Olohan testified that he does not believe his compensation at Google was not at all impacted by his race or his gender. [Olohan Dep. at 134:17 – 22.]

**Response**: Admit.

103.    Olohan testified that he does not believe his job assignments were at all impacted by his race or his gender. [Olohan Dep. at 134:23 – 135:5.]

**Response**: Admit.

104.    Olohan testified that he does not believe his opportunities for job transfers or promotions were at all impacted by his race or gender. [Olohan Dep. at 135:6 – 14.]

**Response**: Denied, as the testimony cited referred to specific opportunities and transfer, while Olohan testified more broadly that his career trajectory at Google, future positions at Google, and termination were impacted. Olohan Dep. 136:8 – 137:18.

105.    Olohan cannot identify any way his being a white male had a negative impact on his employment at Google, other than his termination.  [Olohan Dep. at 135:15 – 137:18.]

**Response**: Denied, as Olohan testified that his career trajectory at Google, future positions at Google, and termination were impacted. Olohan Dep. 136:8 – 137:18.

106.    With the possible exception of Miller, Olohan cannot identify any non-white individual at Google who was treated better than he was. [Olohan Dep. at 146:2 – 148:14.]

**Response**: Denied, as the Olohan testified that "many were given preferential treatment" on the basis of their race. Olohan Dep. 146:23 – 147:6.

107.    Olohan cannot identify any opportunities at Google that he was denied but were offered to a woman. [Olohan Dep. at 134:5 – 15.]

**Response**: Admit.

108.    Olohan testified that Miller did not discriminate against him on the basis of his race.
[Olohan Dep. at 313:25 – 314:5.]

**Response**: Denied, as Olohan testified that Miller discriminated against him on the basis of his
race. Olohan Dep. 98:17-24; 131:19 – 132:5.

109.    Olohan testified that Miller did not discriminate against him on the basis of his gender.
[Olohan Dep. at 314:7 – 10.]

**Response**: Denied, as Olohan testified that Miller discriminated against him on the basis of his
gender. Olohan Dep. 98:17-24; 131:19 – 132:5.

*The 2019 Complaints*

110.    One month after Olohan transferred onto Stewart's team, Stewart received complaints
from multiple employees about Olohan and his conduct. [Tomezsko Decl. ¶ 15, Exh. 14 at GOOG-
OLOHAN-00004174; Olohan Dep. at 266:3 – 6.]

**Response**: Admit.

111.    According to Stewart, employees reported that Olohan had made inappropriate
comments about a client's age, certain team members' race(s), and jokes about possibly being visible
while taking a shower at a team offsite. [Tomezsko Decl. ¶ 15, Exh. 14 at GOOG-OLOHAN-
00004174.]

**Response**: Admit.

112.    When these concerns came to Stewart's attention, he partnered with HR to address these
concerns directly with Olohan. [Tomezsko Decl. ¶ 16, Exh. 15 at GOOG-OLOHAN-00004797;
Tomezsko Decl. ¶ 17, Exh. 16 at GOOG-OLOHAN-00004801.]

**Response**: Admit.

113.    Instead of terminating Olohan's employment in November 2019, Stewart wrote to Olohan, "We are here to help you as a senior leader and would not have taken the step to provide coaching if we did not believe in your ability to be a great leader for CG&E." [Tomezsko Decl. ¶ 15, Exh. 14 at GOOG-OLOHAN-00004172.]

**Response**: Admit the accuracy of the quotation but deny that was chosen "[i]nstead of terminating Olohan's employment in November 2019," which is not supported by the document cited nor any other evidence Plaintiff is aware of.

114.    In the email to Olohan recapping the contents of their coaching conversation about the concerns, Stewart suggested Olohan work with an executive coach. [Tomezsko Decl. ¶ 15, Exh. 14 at GOOG-OLOHAN-00004174.]

**Response**: Admit.

115.    Olohan engaged an executive coach for approximately ten hours of one-on-one sessions. [Tomezsko Decl. ¶ 18, Exh. 17 at GOOG-OLOHAN-00001186; Tomezsko Decl. ¶ 19, Exh. 18 at GOOG-OLOHAN-00004796.]

**Response**: Admit.

116.    The goals identified for Olohan in his executive coach engagement agreement include: "being cognizant of how comments and actions may be perceived;" "determin[ing] a strategy of how to engage a filter in work and social interactions to consider how what is said may be perceived;" and "show[ing] up as an inspiring, motivating, and inclusive leader to my team and sector." [Tomezsko Decl. ¶ 19, Exh. 18 at GOOG-OLOHAN-00004796.]

**Response**: Admit.

117.    Stewart wrote to Olohan in the email addressing the concerns raised, "I expect that you will stop this behavior. If you display the same or similar conduct or are found to violate Google

policy, that will result in further discipline up to termination, in conjunction with the Final Written Warning you have previously received." [Tomezsko Decl. ¶ 15, Exh. 14 at GOOG-OLOHAN-00004174.]

**Response**: Admit.

118.    In response to one of the points raised in Stewart's email, Olohan responded, "My comment to the group is that we have to take DEI seriously from hiring to retention. I stated that FBR clearly has some opportunity to do better." [Tomezsko Decl. ¶ 15, Exh. 14 at GOOG-OLOHAN-00004173.]

**Response**: Admit.

119.    When he made this statement, Olohan did not intend for anyone on his team to make employment decisions based on race or gender because he said this. [Olohan Dep. at 266:3 – 268:11.]

**Response**: Admit.

120.    Olohan also wrote in his response to Stewart, "I 100% understand and agree that I should be held to the highest standard as an Industry Director." [Tomezsko Decl. ¶ 15, Exh. 14 at GOOG-OLOHAN-00004172 – GOOG-OLOHAN-00004173.]

**Response**: Admit.

121.    Olohan testified that he did not do anything to change his behavior following the email from Stewart about employee complaints in 2019. [Olohan Dep. at 272:17 – 20.]

**Response**: Admit.

*The 2020 Complaint*

122.    In April 2020, a different employee raised concerns that Olohan gave her two unwelcome hugs and made inappropriate remarks about age. [Tomezsko Decl. ¶ 20, Exh. 19 at GOOG-OLOHAN-00000092; Olohan Dep. at 274:13 – 25.]

**Response**: Admit, except denied to the extent that it is claimed "a different employee raised concerns that Olohan … made <u>inappropriate</u> remarks about age," as the document cited only mentions "comments referencing age" but never characterizes them as "innapropriate." Tomezsko Decl. ¶ 20, Exh. 19 at GOOG-OLOHAN-00000092.

123.    Two different ER investigators, Ashley Tessier and Pramila Sivapalan, conducted a review of the complaint. [Tomezsko Decl. ¶ 20, Exh. 19 at GOOG-OLOHAN-00000092.]

**Response**: Admit.

124.    ER concluded that Olohan made some of the remarks attributed to him, but did not conclude that his conduct rose to the level of violating any workplace policies. [Tomezsko Decl. ¶ 20, Exh. 19 at GOOG-OLOHAN-00000092; Olohan Dep. at 274:10 – 275:8.]

**Response**: Denied, as the document cited does not state that the comments were those that were "attributed to" Olohan, nor is that supported by any other evidence Plaintiff is aware of. Tomezsko Decl. ¶ 20, Exh. 19 at GOOG-OLOHAN-00000092.

125.    ER conveyed to Olohan the importance of being mindful of his interactions and avoiding any conduct and/or comments that may make others uncomfortable. Tomezsko Decl. ¶ 20, Exh. 19 at [GOOG-OLOHAN-00000092; Olohan Dep. 274:10 – 275:13.]

**Response**: Admit.

126.    ER recommended Olohan re-review the 2018 FWW and Google's Anti-Discrimination Policy. [Tomezsko Decl. ¶ 20, Exh. 19 at GOOG-OLOHAN-00000092; Olohan Dep. at 275:14 – 18.]

**Response**: Admit.

127.    Olohan does not recall reviewing the FWW as instructed. [Olohan Dep. at 275:14 – 21.]

**Response**: Admit.

128.    Olohan testified he does not recall doing anything to change his behavior following the

investigation into concerns raised about his behavior in 2020. [Olohan Dep. at 275:25 – 276:6.]

**Response**: Admit.

*The 2022 Offsite and Related Complaints*

129.    Olohan hosted a team offsite at his beach house in New Jersey on April 26 – 27, 2022.
[Olohan Dep. at 276:14 – 21; Tomezsko Decl. ¶ 21, Exh. 20 at GOOG-OLOHAN-00003474.]

**Response**: Admit.

130.    Four employees on Olohan's team were primarily responsible for planning the offsite.
[Tomezsko Decl. ¶ 21, Exh. 20 at GOOG-OLOHAN-00003474; Tomezsko Decl. ¶ 22, Exh. 21 at
GOOG-OLOHAN-00002467.]

**Response**: Admit.

131.    ER concluded that Olohan had influence over the offsite planning committee.
[Tomezsko Decl. ¶ 23, Exh. 22 at GOOG-OLOHAN-00000272; Alvarez Dep. at 101:2 – 15.]

**Response**: Admit.

132.    Neither Stewart nor Schiestel were part of the team responsible for planning the offsite.
[Schiestel Dep. at 28:11 – 29:6; Stewart Dep. at 112:13 – 25; Tomezsko Decl. ¶ 21, Exh. 20 at GOOG-
OLOHAN-0003474; Tomezsko Decl. ¶ 22, Exh. 21 at GOOG-OLOHAN-00002467.]

**Response**: Denied, as Schiestel was aware of offsite plans in advance. Stewart Dep. 113:11-15.
Schiestel knew about offsite and lodging arrangements at least five days ahead of time. Schiestel Dep.
28:11-17; 32:12-18. Schiestel confirmed that the planning of the event was inclusive in advance of it
happening and then was no longer concerned about the lodging arrangements. Schiestel Dep. 30:2-7;
34:13-16. Schiestel would have taken action in her HR role if lodging was not inclusive but did not
because she did not think sleeping arrangements violated any policies. Schiestel Dep. 36:9-15; 37:5-8.

133.    Neither Miller, Schiestel, nor Stewart were physically present for the offsite. [Olohan

Dep. at 306:13 – 15; Stewart Dep. at 182:19 – 183:4; Schiestel Dep. at 32:8 – 9.]

**Response**: Admit..

134.    Attendees were given the option to stay in one of six bedrooms at Olohan's beach house with him, or at a nearby hotel. [Tomezsko Decl. ¶ 23, Exh. 22 at GOOG-OLOHAN-00000266; Tomezsko Decl. ¶ 21, Exh. 20 at GOOG-OLOHAN-00003474.]

**Response**: Admit.

135.    The only individuals who chose to stay with Olohan at his beach house were men. [Tomezsko Decl. ¶ 23, Exh. 22 at GOOG-OLOHAN-00000266.]

**Response**: Admit.

136.    According to ER, at least one witness interviewed in connection with the investigation into the offsite reported that the only individuals who elected to stay with Olohan at his beach house were heterosexual men. [Tomezsko Decl. ¶ 23, Exh. 22 at GOOG-OLOHAN-00000266.]

**Response**: Admit.

137.    The women invited to the offsite all elected to stay at the nearby hotel. [Tomezsko Decl. ¶ 23, Exh. 22 at GOOG-OLOHAN-00000266.]

**Response**: Admit.

138.    According to ER, the individuals who chose to stay at the nearby hotel reported not feeling comfortable staying at Olohan's house, specifically referencing sharing a bathroom or a space. [Tomezsko Decl. ¶ 23, Exh. 22 at GOOG-OLOHAN-00000266.]

**Response**: Admit.

139.    According to Schiestel, when Olohan told her about the lodging arrangements just five days before the event, she flagged for Olohan that the arrangements could be perceived negatively, as favoritism. [Schiestel Dep. at 32:19 – 33:10.]

**Response**: Admit.

140.    According to ER, one witness interviewed in connection with the investigation into the offsite who elected to stay at the nearby hotel reported feeling excluded because "we go back to the hotel and the people at the house [were] still hanging out, or hanging out in the morning. [It's] a little uncomfortable as you didn't want to feel excluded for not being in the house." [Tomezsko Decl. ¶ 23, Exh. 22 at GOOG-OLOHAN-00000267.]

**Response**: Admit.

141.    Olohan was aware that, as a manager, he had an obligation not to facilitate or promote excessive drinking. [Olohan Dep. at 285:25 – 286:4.]

**Response**: Admit.

142.    Olohan testified that "people shouldn't be drinking too much at events, and certainly not at [his] events. Yes, it's inappropriate." [Olohan Dep. at 278:21 – 279:4.]

**Response**: Admit.

143.    Olohan purchased the alcohol for the offsite event at his beach house. [Olohan Dep. 356:7 – 24; Tomezsko Decl. ¶ 24, Exh. 23 at GOOG-OLOHAN-00002464.]

**Response**: Admit.

144.    Receipts Olohan submitted for reimbursement in connection with the offsite event show that he purchased $579.73 worth of beer and liquor for the "FBR Leads Offsite April 2022." [Schiestel Decl. ¶¶ 23, 24, Exh. 4 at GOOG-OLOHAN-00005253.]

**Response**: Admit.

145.    According to the agenda for the offsite, three hours were devoted to structured, business related content on Day 2. [Tomezsko Decl. ¶ 21, Exh. 20 at GOOG-OLOHAN-00003476.]

**Response**: Admit.

146.    According to the agenda for the offsite, three hours of the evening of Day 1 were devoted to a "[c]asual backyard hang" at Olohan's home. [Tomezsko Decl. ¶ 21, Exh. 20 at GOOG-OLOHAN-00003475.]

**Response**: Admit.

147.    According to the agenda for the offsite, five hours of the afternoon of Day 2 were devoted to "Fun Activities / Unstructured Time Together" and "Free Time / Freshen Up." [Tomezsko Decl. ¶ 21, Exh. 20 at GOOG-OLOHAN-00003476.]

**Response**: Admit.

148.    The agenda notes a "session" devoted to "Firepit S'more and Hang" from "9pm--??" at Olohan's house the evening of Day 2. [Tomezsko Decl. ¶ 21, Exh. 20 at GOOG-OLOHAN-00003477.]

**Response**: Admit.

149.    Plaintiff was aware of the agenda for the offsite. [Tomezsko Decl. ¶ 22, Exh. 21 at GOOG-OLOHAN-00002466.]

**Response**: Admit.

150.    According to ER, witnesses later interviewed in connection with the investigation into the offsite reported that attendees drank alcohol during the unstructured free time before and after the team dinner. [Tomezsko Decl. ¶ 23, Exh. 22 at GOOG-OLOHAN-00000270.]

**Response**: Admit.

151.    Attendees at the offsite played beer pong at Olohan's home. [Tomezsko Decl. ¶ 23, Exh. 22 at GOOG-OLOHAN-00000270; Tomezsko Decl. ¶¶ 25, 26, Exhs. 24, 25 at GOOG-OLOHAN-00002676, GOOG-OLOHAN-00002681; Olohan Dep. at 295:19 – 297:4.]

**Response**: Admit.

152.    One attendee at Olohan's offsite passed out from excessive alcohol consumption.

[Olohan Dep. at 278:17 – 20; 289:21 – 290:14; Tomezsko Decl. ¶ 23, Exh. 22 at GOOG-OLOHAN-00000270.]

**Response**: Denied, as the statement is not supported by the evidence cited. The deposition testimony cited reflects Olohan's uncertainty about whether the individual had passed out, and that he spoke with the individual that night, indicating that the individual had not passed out. Olohan Dep. 289:23 – 290:7. The document cited only contains the allegation that "one attendee either 'passed out' or 'fell off' the couch." Tomezsko Decl. ¶ 23, Exh. 22 at GOOG-OLOHAN-00000270.

153.     Police were called the second night of the offsite due to a noise complaint. [Olohan Dep. at 290:15 – 291:6; Tomezsko Decl. ¶ 23, Exh. 22 at GOOG-OLOHAN-00000271.]

**Response**: Admit.

154.     According to ER, multiple attendees later interviewed in an investigation into the offsite reported that drinking alcohol at the event was emphasized or was a "core tie across the events." [Tomezsko Decl. ¶ 23, Exh. 22 at GOOG-OLOHAN-00000270.]

**Response**: Admit.

155.     According to ER, one attendee described the offsite as a "frat party." [Tomezsko Decl. ¶ 23, Exh. 22 at GOOG-OLOHAN-00000271.]

**Response**: Admit.

156.     Concerns about the offsite were raised to ER's attention in May 2022. [Alvarez Dep. at 29:2 – 9.]

**Response**: Admit.

157.     ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮ raised concerns to ER, directly or indirectly, about Olohan's offsite, on their own behalf or on behalf of others. [Alvarez Dep. at 29:2 – 30:11, 92:19 – 93:5; Tomezsko Decl. ¶ 27, Exh. 26 at GOOG-OLOHAN-00000628, Alvarez Dep. at

105:3 – 24; Olohan Dep. at 277:11 – 278:4, 298:16 – 299:25.]

    **Response**: Admit.

    158.    █████ raised concerns to Schiestel on behalf of ████ and Schiestel escalated those concerns to ER. [Schiestel Decl. ¶ 25.]

    **Response**: Admit.

    159.    According to Schiestel, Miller played no role in the offsite investigation process. [Schiestel Dep. at 134:25 – 135:21; Alvarez Dep. at 85:10 – 86:4.]

    **Response**: Admit.

    160.    Cecilia Alvarez was the lead ER investigator assigned to investigate the concerns related to Olohan's offsite, with assistance from Carlos Sousa and Michelle Thompson. [Alvarez Decl. ¶ 4, Declaration of Carlos Eduardo De Sousa ("Sousa Decl.") ¶ 3, Declaration of Michelle Thompson ("Thompson Decl.") ¶ 3.]

    **Response**: Admit.

    161.    According to Alvarez, Miller did not participate in the investigation process, nor did she raise concerns to any of the other investigators assigned to investigate concerns related to Olohan's offsite. [Alvarez Dep. at 85:10 – 86:4.]

    **Response**: Admit.

    162.    Miller has never had a conversation with Cecilia Alvarez, ████████ ████████ Jacky Schiestel, or Adam Stewart about Olohan's offsite. [Miller Dep. at 140:21 – 142:8.]

    **Response**: Denied, as Miller and ████████ were friends and ███ ████ reported to ████████ (Olohan Dep. 300:9-21), Stewart communicated with Miller on a weekly basis (Stewart Dep. 187:24 – 188:5), and members of Olohan's team told him that Miller was behind the complaints that led to the termination and that she took great joy in hearing about it (Olohan Dep.

301:7 – 303:3; 305:18-25; 313:4-13).

163.    ER investigators interviewed Olohan in connection with the investigation into his

offsite. [Olohan Dep. at 276:14 – 24.]

**Response**: Admit.

164.    ER concluded that Plaintiff's actions as a leader created or facilitated an environment

during the offsite that lacked a sense of inclusivity in violation of Google's Obligations of a Manager

policy. [Tomezsko Decl. ¶ 23, Exh. 22 at GOOG-OLOHAN-00000267.]

**Response**: Admit.

165.    ER also concluded that Olohan's actions as a leader created or facilitated an

environment during the offsite event that encouraged or structurally facilitated excessive drinking in

violation of Google's policy on Alcohol use, smoking, and drugs. [Tomezsko Decl. ¶ 23, Exh. 22 at

GOOG-OLOHAN-00000272.]

**Response**: Admit.

166.    At dinner during the offsite, Olohan discussed his prior experiences with HR and ER.

[Olohan Dep. at 291:16 – 292:3.]

**Response**: Admit.

167.    Olohan repeated over dinner the statement about preferring fast walkers that was the

subject of his 2018 FWW and for which he had previously received discipline. [Olohan Dep. at 292:4 –

24; Tomezsko Decl. ¶ 23, Exh. 22 at GOOG-OLOHAN-00000269.]

**Response**: Admit.

168.    According to ER, the witness who reported Olohan's statement about fast walkers to ER

considered it ableist and felt as if it "reinforce[d] that frat bro mentality, almost as if he was bragging

that he got away with this because of his position." [Tomezsko Decl. ¶ 23, Exh. 22 at GOOG-

OLOHAN-00000268.]

**Response**: Admit.

169.     According to ER, Olohan admitted to repeating the statement about preferring fast walkers that was the subject of his prior FWW, although he did not concede making that statement during the dinner. [Tomezsko Decl. ¶ 23, Exh. 22 at GOOG-OLOHAN-00000269.]

**Response**: Admit.

170.     According to ER, Olohan also admitted during the investigation, he had repeated the statement about wanting to punch someone in the face that was the subject of his prior FWW. [Tomezsko Decl. ¶ 23, Exh. 22 at GOOG-OLOHAN-00000269.]

**Response**: Denied, as according to the document cited, Olohan did not "repeat[]" that statement but referenced it as "an example of what not to say." Tomezsko Decl. ¶ 23, Exh. 22 at GOOG-OLOHAN-00000269.

171.     According to ER, although Plaintiff made these comments as examples of what not to say, he nonetheless lacked foresight or consideration that repeating these comments in front of his direct reports would once again foster an environment where employees felt uncomfortable. [Tomezsko Decl. ¶ 23, Exh. 22 at GOOG-OLOHAN-00000269.]

**Response**: Admit.

172.     ER also concluded that Plaintiff exercised poor judgment and demonstrated a fundamental lack of understanding of the impact of his words by repeating the comments that had been the subject of prior ER reviews. [Tomezsko Decl. ¶ 23, Exh. 22 at GOOG-OLOHAN-00000269.]

**Response**: Admit.

173.     Olohan knew the investigation into his offsite was underway before he was interviewed, but he and other members of his team believed the individual who passed out from excessive

consumption of alcohol was the subject of the investigation. [Olohan Dep. at 277:14 – 278:20; 281:19 – 283:5.]

**Response**: Admit.

174.    Olohan discussed the investigation into his offsite with members of his team while the investigation was ongoing. [Olohan Dep. at 278:10 – 16; 281:19 – 283:5.]

**Response**: Admit.

175.    According to ER, Olohan refused to provide the names of employees with whom he spoke about the investigation. [Tomezsko Decl. ¶ 23, Exh. 22 at GOOG-OLOHAN-00000273.]

**Response**: Admit.

176.    According to ER, Olohan's refusal to provide the names of employees with whom he discussed the investigation prevented ER from addressing confidentiality concerns or monitoring for potential retaliation. [Tomezsko Decl. ¶ 23, Exh. 22 at GOOG-OLOHAN-00000273.]

**Response**: Admit.

177.    ER concluded that even a single discussion of an ongoing review could cause a chilling effect and create an environment where employees do not feel safe to raise concerns or participate in an investigation. [Tomezsko Decl. ¶ 23, Exh. 22 at GOOG-OLOHAN-00000273.]

**Response**: Admit.

178.    At the conclusion of the investigation, Alvarez summarized the allegations, findings, and recommendations in a written report. [Alvarez Dep. at 101:1 – 15; Tomezsko Decl. ¶ 23, Exh. 22 at GOOG-OLOHAN-00000265 – GOOG-OLOHAN-00000275.]

**Response**: Admit.

179.    At the conclusion of the investigation, Alvarez recommended Google terminate Olohan's employment for violation of Google's Alcohol Policy and Anti-Discrimination Policy,

(specifically, the Obligations as a manager and Harassment sections). [Alvarez Dep. at 53:2 – 54:18.]

**Response**: Admit.

180.    Alvarez discussed the recommendation with Sousa and Thompson, both of whom agreed with the recommendation to terminate. [Alvarez Dep. at 53:2 – 54:18.]

**Response**: Admit.

181.    Alvarez and others in ER calibrated the recommendation against other, similar cases and concluded termination was the appropriate disciplinary recommendation. [Alvarez Dep. at 51:22 – 53:1.]

**Response**: Denied, as the recommendation was not, with respect to the alleged alcohol policy violation, calibrated with other instances of far more excessive drinking at Google, including that Stewart served shots of alcohol at his offsites, resulting in an employee becoming ill and vomiting (Olohan Dep. 279:5-8; 280:22 – 281:3), two employees became visibly intoxicated at the offsite, one was unable to speak clearly and the other was having a hard time walking (Stewart Dep. 169:16-18; ███████ Dep. 36:6-21), Stewart was responsible for alcohol consumption at his offsites but faced no discipline (Stewart Dep. 170:15-25), shots of alcohol are served at Google's holiday parties (Stewart Dep. 183:21-24), most Google events did not have an alcohol limit (███████ Dep. 23:6-12), there was always one or two CG&E members who drank too much at offsites (███████ Dep. 25:10-25), and the amount of alcohol served at Olohan's offsite was not excessive (Giuliano Dep. 15:22 – 16:1; Rissmiller Decl. Ex. F (GOOG-OLOHAN-00000628)). With respect to the alleged non-inclusivity of the event, Schiestel knew about offsite and lodging arrangements at least five days ahead of time (Schiestel Dep. 28:11-17; 32:12-18), confirmed that the planning of the event was inclusive in advance of it happening and then was no longer concerned about the lodging arrangements (Schiestel Dep. 30:2-7; 34:13-16), attendees had the option of where to stay and women attendees were fine with options but were

"happier staying in a hotel with their own bathroom" (Schiestel Dep. 33:11-19), and Schiestel would have taken action in her HR role if lodging was not inclusive but did not because she did not think sleeping arrangements violated any policies (Schiestel Dep. 36:9-15; 37:5-8).

182.    The recommendation to terminate Olohan's employment took into account the prior coachings and warnings he had received over the years. [Tomezsko Decl. ¶ 23, Exh. 22 at GOOG-OLOHAN-00000275, Alvarez Dep. at 54:24 – 58:3.]

**Response**: Denied, as Google ER wrote that "Olohan was terminated 8/5/22 as a result of allegations raised in Case 360 case #25645." Rissmiller Decl. Ex. T (GOOG-OLOHAN-00000254).

183.    Alvarez noted in her report and recommendation, "The number of opportunities to cure this pattern of repeated behavior and the demonstrated lack of understanding necessitating a change to conduct suggests that warnings have not had the desired impact on [Olohan's] behavior," and his actions and comments, "whether intentional or not, continue to create an environment where his direct reports feel uncomfortable, and result in a failure to promote, create, or uphold, and [*sic*] a safe and inclusive workplace." [Tomezsko Decl. ¶ 23, Exh. 22 at GOOG-OLOHAN-00000275.]

**Response**: Admit.

184.    Alvarez transmitted her report and recommendation to Stewart for review and approval. [Alvarez Dep. at 101:20 – 102:1.]

**Response**: Admit.

185.    At all times during the investigation, through and including the date she recommended Google terminate Olohan's employment, Alvarez had no knowledge of Olohan having raised concerns about alleged harassment (sexual or otherwise) during his employment with Google. [Alvarez Decl. ¶ 5; Olohan Dep. at 213:16 – 22.]

**Response**: Admit.

186.    At all times during the investigation, through and including the date he discussed with Alvarez the recommendation to terminate Olohan's employment, Sousa had no knowledge of Olohan having raised concerns about alleged harassment (sexual or otherwise) during his employment with Google. [Sousa Decl. ¶ 4; Olohan Dep. at 213:16 – 22.]

**Response**: Admit.

187.    At all times during the investigation, through and including the date she discussed with Alvarez the recommendation to terminate Olohan's employment, Thompson had no knowledge of Olohan having raised concerns about alleged harassment (sexual or otherwise) during his employment with Google. [Thompson Decl. ¶ 4; Olohan Dep. at 213:16 – 22.]

**Response**: Admit.

*Additional Concerns Surface*

188.    In July 2022, while the investigation into Olohan's offsite was still ongoing, ██████ ██████ raised additional concerns about Olohan, which were ultimately escalated to ER. [Alvarez Decl. ¶ 10, Exh. 3 at GOOG-OLOHAN-00000604.]

**Response**: Admit.

189.    ER's investigation notes with witnesses reflect that ██████ had returned from maternity leave approximately five months prior to raising her concerns about Olohan. [Alvarez Decl. ¶ 10, Exh. 3 at GOOG-OLOHAN-00000604.]

**Response**: Admit.

190.    ER's investigation notes with witnesses reflect Olohan told ██████ he was displeased with her performance and that she did not seem as engaged as she was before her maternity leave. [Alvarez Decl. ¶ 10, Exh. 3 at GOOG-OLOHAN-00000604.]

**Response**: Admit.

191.    ER's investigation notes with witnesses reflect that when ▮▮▮▮▮▮ informed Olohan of her intention to travel to New York for a client pitch, Olohan asked her, in sum or substance, who was going to take care of her young family while she was traveling. [Alvarez Decl. ¶ 10, Exh. 3 at GOOG-OLOHAN-00000604.]

**Response**: Admit.

192.    ER's investigation notes with witnesses reflect that Olohan's comment made ▮▮▮▮▮▮ uncomfortable. [Alvarez Decl. ¶ 10, Exh. 3 at GOOG-OLOHAN-00000604.]

**Response**: Admit.

193.    In August 2022, a different employee, ▮▮▮▮▮▮ reported to HR a comment Olohan had made in June 2022 about a potential speaker for an industry event. [Tomezsko Decl. ¶ 28, Exh. 27 at GOOG-OLOHAN-00000418.]

**Response**: Admit.

194.    According to ▮▮▮▮▮▮ Olohan made "a very condescending remark where he said 'no one was going to fly across the country to see some female CEO speak,'" which he repeated a few minutes later. [Tomezsko Decl. ¶ 28, Exh. 27 at GOOG-OLOHAN-00000418.]

**Response**: Admit.

195.    On July 1, 2022, Olohan apologized to ▮▮▮▮▮▮ and the other women who witnessed the "female CEO" comment. [Tomezsko Decl. ¶ 28, Exh. 27 at GOOG-OLOHAN-00000418.]

**Response**: Admit.

196.    In that email exchange with ▮▮▮▮▮▮ and others, Olohan did not deny making the "female CEO" comment. [Tomezsko Decl. ¶ 28, Exh. 27 at GOOG-OLOHAN-00000418.]

**Response**: Denied, Olohan wrote that as he "was floored by this since [his] ONLY objection to the speaker was the $20k price tag." Tomezsko Decl. ¶ 28, Exh. 27 at GOOG-OLOHAN-00000418.

*Olohan's Termination*

197.    Olohan's employment was terminated on August 5, 2022. [Olohan Dep. at 307:14 – 16.]

**Response**: Admit.

198.    Stewart made the decision to accept ER's recommendation and terminate Olohan's employment. [Stewart Dep. at 23:3 – 25; 82:4 – 7; Tomezsko Decl. ¶ 29, Exh. 28 at GOOG-OLOHAN-00001218; Olohan Dep. at 319:12 – 22.]

**Response**: Admit.

199.    According to Google's records, Olohan's employment was terminated because he violated Google's Alcohol Policy and the Anti-Discrimination Policy (specifically, the Obligations as a manager and Harassment sections). [Tomezsko Decl. ¶ 29, Exh. 28 at GOOG-OLOHAN-00001219.]

**Response**: Admit.

200.    Stewart testified that Olohan was terminated because he "violated multiple Google policies after having previously … received a final written warning for other policy violations." [Stewart Dep. at 82:4 – 13.]

**Response**: Admit.

201.    Stewart's stated reason for believing termination was appropriate is his belief that "Ryan was given ample support to overcome some of the challenges that he had a leader and was unable to do so during his time at Google." [Stewart Dep. at 92:17 – 93:10.]

**Response**: Admit.

202.    When he made the decision to terminate Olohan's employment, Stewart was not aware that Olohan had allegedly raised a concern of purported sexual harassment against Miller. [Olohan Dep. at 205:7 – 21; Stewart Dep. at 214:21 – 25; 217:25 – 218:22.]

**Response**: Denied, as Olohan testified that Stewart was "well aware" of his sexual harassment

complaints against Miller. Olohan Dep. 205:7-18.

203.    According to Stewart, Miller played no role in his decision to terminate Olohan's employment. [Stewart Dep. at 134:8 – 9.]

**Response**: Admit.

204.    Stewart's compensation and performance rating is not affected by the gender or racial diversity of his direct reports. [Stewart Dep. at 47:2 – 5; 50:24 – 51:12; 54:17 – 22; Schiestel Dep. at 88:17 – 25; 90:8 – 14.]

**Response**: Denied, as inclusiveness in the context of DEI is part of performance evaluation, which can affect compensation. Stewart Dep. 47:7 – 48:17; 49:22 – 50:2.

205.    Alvarez participated in the termination discussion with Olohan on August 5, 2022. [Olohan Dep. at 307:14 – 25.]

**Response**: Admit.

206.    During that discussion, Alvarez discussed the reasons for the termination and walked Olohan through ER's findings contained in Alvarez's report and recommendation. [Stewart Dep. at 108:7 – 20; Alvarez Dep. at 131:9 – 132:7; Tomezsko Decl. ¶ 30, Exh. 29 at GOOG-OLOHAN-00004450; Olohan Dep. at 308:6 – 18.]

**Response**: Admit.

207.    After his termination, Olohan's position was filled by Melissa Poulos. [Schiestel Decl. ¶ 26.]

**Response**: Admit.

208.    According to Google's records, Poulos identifies as a white woman. [Schiestel Decl. ¶ 32.]

**Response**: Admit.

209.    According to Olohan, Poulos is qualified for the role. [Olohan Dep. at 98:4 – 15.]

**Response**: Admit.

210.    The day of his termination, Olohan texted a coworker and said he was terminated because "[he] said 'I don't want to hire anyone who won't hustle,' [s]omeone said [he's] not inclusive, and there was drinking at his offsite." [Tomezsko Decl. ¶ 31, Exh. 30 at PL0087; Olohan Dep. at 340:22 – 341:21.]

**Response**: Admit.

211.    Olohan did not state in that text message that he was terminated because of anything Miller did, because he had raised complaints, or because of his race or gender. [Tomezsko Decl. ¶ 31, Exh. 30 at PL0087; Olohan Dep. at 340:22 – 343:20.]

**Response**: Admit.

212.    The day of his termination, Olohan texted a coworker that he was fired "[b]ecause [he] promoted excessive drinking." [Tomezsko Decl. ¶ 32, Exh. 31 at PL0084; Olohan Dep. at 343:21 – 344:9.]

**Response**: Admit.

213.    Olohan did not state in that text message that he was terminated in part because of anything Miller did, because he had raised complaints, or because of his race or gender. [Tomezsko Decl. ¶ 32, Exh. 31 at PL0084; Olohan Dep. at 344:13 – 19.]

**Response**: Admit.

214.    The day of his termination, Olohan texted a coworker, "to shoot straight, they fired me today because someone accused me of not being inclusive." Olohan referred to the reasons for his termination as "insane" and blamed it on "Google's insane woke corporate culture." [Tomezsko Decl. ¶ 33, Exh. 32 at PL0092; Olohan Dep. at 349:11 – 350:25.]

**Response**: Admit.

215.    Olohan did not state in that text message that he was terminated in part because of anything Miller did, because he had raised complaints, or because of his race or gender. [Tomezsko Decl. ¶ 33, Exh. 32 at PL0092; Olohan Dep. at 350:18 – 25.]

**Response**: Admit.

216.    The day of his termination, Olohan texted a coworker, "Before Adam etc can say I was fired for something bad, they fired me for 'failing to create an inclusive environment' and facilitated excessive drinking at the off-site because one person had one too many one night. They also said I said 'I do not want to hire people who do not have hustle.'" [Tomezsko Decl. ¶ 34, Exh. 33 at PL0085; Olohan Dep. at 352:24 – 354:4.]

**Response**: Admit.

217.    Olohan did not state in that text message that he was terminated in part because of anything Miller did, because he had raised complaints, or because of his race or gender. [Tomezsko Decl. ¶ 34, Exh. 33 at PL0085; Olohan Dep. at 354:5 – 10.]

**Response**: Admit.

218.    The day after his termination, Olohan texted an acquaintance that Google fired him because he "refused to bow to the woke mobs and list [his] pronouns." [Tomezsko Decl. ¶ 35, Exh. 34 at PL0102; Olohan Dep. at 338:23 – 339:21.]

**Response**: Admit.

219.    Olohan did not state in that text message that he was fired in part because of anything Miller did, because he had raised complaints, or because of his race or gender. [Tomezsko Decl. ¶ 35, Exh. 34 at PL0102; Olohan Dep. at 340:9 – 21.]

**Response**: Admit.

220.     The day after his termination, Olohan texted a former coworker that he was fired because he was "accused of 'not being inclusive' by one underperformer," because he engaged in favoritism, and because he admitted he said, "I do not like to hire people who are not hustlers." Olohan further texted that the proffered reasons for the termination were "just an excuse because [he] wouldn't list [his] pronouns so [is] clearly not inclusive." Olohan referred to the termination rationale as "insane," and texted, "I knew the woke mob would get me one day." Olohan also referred to those who accused him of misconduct as "loser employees." [Tomezsko Decl. ¶ 36, Exh. 35 at PL0103; Olohan Dep. at 351:2 – 352:13.]

**Response**: Admit.

221.     Olohan did not state in that text message that he was fired in part because of anything Miller did, because he had raised complaints, or because of his race or gender. [Tomezsko Decl. ¶ 36, Exh. 35 at PL0103; Olohan Dep. at 352:14 – 23.]

**Response**: Admit.

222.     Nine days after his termination, Olohan texted an acquaintance, "I actually was fired because an awful employee accused me of not being inclusive (kiss of death) for admitting to not hiring people who won't hustle." Olohan also texted, "I was accused of something similar 6 years ago when firing a HOI so I clearly have a pattern." [Tomezsko Decl. ¶ 36, Exh. 35 at PL0141; Olohan Dep. at 357:21 – 358:20.]

**Response**: Admit.

223.     Olohan did not state in that text message that he was fired in part because of anything Miller did, because he had raised complaints, or because of his race or gender. [Tomezsko Decl. ¶ 36, Exh. 35 at PL0141.]

**Response**: Admit.

224.    Olohan testified that he finds it "completely laughable that they would accuse [him] of fostering too much drinking at [his] event." [Olohan Dep. at 288:21 – 289:10.]

**Response**: Admit.

225.    Olohan testified that he considers the allegations of his misconduct "ridiculous." [Olohan Dep. at 146:23 – 147:15; 221:16 – 20.]

**Response**: Denied, as Olohan only testified that "some of these allegations I'm sure we'll get to are ridiculous." Olohan Dep. 147:3-15.

226.    Olohan described the individual who raised concerns about him in 2013 "a highly underperforming employee who was in the process of being fired." [Olohan Dep. at 253:9 – 18.]

**Response**: Admit.

227.    Olohan described the individual who raised concerns about him in 2014 "crazy" and called her a "struggling employee." [Olohan Dep. at 254:14 – 255:7; 257:4 – 13.]

**Response**: Denied, as Olohan testified that the situation in which that employee "hook[ed] up with some guy" and the employee's complaints were "crazy," not that the employee was crazy. Olohan Dep. 254:18 – 255:7.

228.    Olohan described the individual who raised concerns about him in 2017 as "in the process of being fired when she brought up these charges, once again." [Olohan Dep. at 260:2 – 5.]

**Response**: Admit.

229.    Olohan attributed the employee complaints raised about him in 2019 to "underperforming employees on [performance improvement] plans." [Tomezsko Decl. ¶ 15, Exh. 14 at GOOG-OLOHAN-00004171.]

**Response**: Admit.

*The Fig & Olive Dinner*

230.    Olohan and Miller attended a dinner for Stewart's leadership team at Fig & Olive in December 2019. [Olohan Dep. at 152:3 – 153:10.]

**Response**: Admit.

231.    According to Olohan, Miller grazed Plaintiff's stomach with her fingertips for no more than two seconds and said he had nice abs. [Olohan Dep. at 165:23 – 168:10.]

**Response**: Denied, as Miller rubbed Olohan's stomach from top to bottom with her fingers and told him he had "nice abs." Olohan Dep. 165:23 – 166:6; 166:19-22; 168:3-10; Angeledes Dep. 40:21 – 42:2; 43:1-5; 57:14-18.

232.    Olohan testified that he could not recall any other allegedly inappropriate statements Miller directed to him that night. [Olohan Dep. at 165:23 – 166:18; 168:19 – 170:24; 187:17 – 21.]

**Response**: Admit.

233.    After Miller allegedly touched his stomach, Olohan "laughed it off and moved on." [Olohan Dep. at 172:17 – 22.]

**Response**: Denied, as Olohan testified that he did not remember and only assumed that is what happened. Olohan Dep. 172:17-22.

234.    Olohan describes himself as "not easily offended," and "fairly hard to offend." [Olohan Dep. at 184:14 – 185:10; 244:25 – 245:5.]

**Response**: Admit.

235.    Olohan did not understand Miller to be propositioning him in any way when she allegedly touched him at Fig & Olive. [Olohan Dep. at 178:19 – 22; 244:18 – 24.]

**Response**: Denied, as the statement that "Olohan did not understand Miller to be propositioning him in any way" is not supported by the deposition testimony cited nor any other evidence Plaintiff is aware of.

236.   Olohan testified, "[T]here's never a time where Tiffany I felt, like, propositioned me or did anything in that line." [Olohan Dep. at 244:18 – 24.]

**Response**: Admit.

237.   Olohan testified that he did not feel unsafe when Miller allegedly touched him at Fig & Olive. [Olohan Dep. at 179:12 – 16.]

**Response**: Admit.

238.   Olohan testified that he did not feel threatened in any way when Miller allegedly touched him at Fig & Olive. [Olohan Dep. at 179:18 – 19.]

**Response**: Admit.

239.   Olohan did not immediately leave the event at Fig & Olive after Miller allegedly touched him. [Olohan Dep. at 182:14 – 183:17.]

**Response**: Admit.

240.   Olohan testified he does not recall losing sleep over Miller allegedly touching him at Fig & Olive. [Olohan Dep. at 194:8 – 10.]

**Response**: Admit.

241.   Olohan testified that he did not get emotional or cry about it when Miller allegedly touched him at Fig & Olive. [Olohan Dep. at 194:12 – 23.]

**Response**: Admit.

242.   Olohan was not scared to go back into work after Miller allegedly touched him at Fig & Olive. [Olohan Dep. at 194:25 – 195:4.]

**Response**: Admit.

243.   Olohan testified that touching someone's stomach is a "minor fraction:"

Q: Did you tell ▮▮▮▮▮▮ that she had touched you?

45

A: I don't recall, nor do I think it even mattered that much.

Q: What do you mean, it didn't matter that much?

[…]

A: I literally just started on the team. The last thing I want to do is start making waves, that I'm complaining about what some might consider little minor infractions. Not that ▮▮▮▮▮▮ would, but – so – but I don't remember the specifics.

Q: Okay. Do you consider it a minor infraction?

[…]

A: Touching someone on their stomach?

Q: Uh-huh.

A: Yes, of course.

[Olohan Dep. at 186:18 – 187:16.]

**Response**: Denied, as Olohan clarified later in the deposition that he thought he was being asked whether Miller rubbing his stomach was a major infraction, which he believed it was. Olohan Dep. 370:25 – 371:10. Olohan accordingly corrected the testimony now cited through an errata sheet.

244.    Olohan testified that he reported Miller touching him inappropriately at Fig & Olive to Purnima Menon in 2019. [Olohan Dep. at 195:5 – 196:21.]

**Response**: Admit.

245.    Assuming for purposes of this motion that Olohan reported the alleged incident to Menon, he only did so within a few weeks of the alleged incident "because I was being unfairly accused of something ridiculous, and [he] brought up this as an example to HR. That's – otherwise, [he] would not have even brought it up." [Olohan Dep. at 194:12 – 23.]

**Response**: Admit.

246.    Assuming for purposes of this motion that Olohan reported the alleged incident to Menon, he testified that he was satisfied with Human Resources' response at the time. [Olohan Dep. at 204:8 –

17.]

**Response**: Denied, as the testimony cited only contains the statement that Olohan "was fine" not that he was satisfied with the response. Olohan Dep. 204:8-17.

247.    Assuming for purposes of this motion that Olohan reported the alleged incident to Jacky Schiestel in Human Resources, Olohan allegedly informed Schiestel during one of their one-on-one meetings. [Olohan Dep. at 207:6 – 209:9; 211:8 – 11.]

**Response**: Admit.

248.    Assuming for purposes of this motion that Olohan reported the alleged incident to Schiestel, he did so on an occasion where Schiestel informed him that Miller had raised complaints about Olohan engaging in microaggressions. [Olohan Dep. at 207:6 – 209:9; 214:16 – 216:24.]

**Response**: Admit.

249.    Olohan testified that Schiestel said Miller was "being petty." [Olohan Dep. at 221:11 – 20.]

**Response**: Admit.

250.    Assuming for purposes of this motion that Olohan reported the alleged incident to Schiestel, the one-on-one meetings where that may have occurred were "sometime between 2020 and the end of 2021." [Olohan Dep. at 214:16 – 217:11.]

**Response**: Admit.

251.    In 2021, Olohan wrote to Miller in an email that she was "a good friend." [Tomezsko Decl. ¶ 38, Exh. 37 at GOOG-OLOHAN-00003997.]

**Response**: Admit.

252.    Also in 2021, Olohan wrote to Schiestel in an email that he was in a "much better place" with Stewart than in 2019, and "now we are flying!" [Tomezsko Decl. ¶ 15, Exh. 14 at GOOG-

OLOHAN-00004171.]

**Response**: Admit.

253.    In February 2022, Miller asked Olohan to give her constructive feedback in her performance review, and Olohan readily agreed, writing, "Of course Tiff! Our teams have done some great things together so would be happy to!!" [Tomezsko Decl. ¶ 39, Exh. 38 at GOOG-OLOHAN-00004056.]

**Response**: Admit.

*Alleged Inappropriate Comments*

254.    Olohan testified that Miller made comments about his purported affinity for Asian women between five and ten times over a three-year period. [Olohan Dep. at 239:12 – 18.]

**Response**: Admit.

255.    Olohan can only recall with specificity a single instance of Miller allegedly making a comment about his purported affinity for Asian women, at a karaoke event following an offsite in April 2022. [Olohan Dep. at 239:12 – 18.]

**Response**: Denied, as the statement is not supported by the deposition testimony cited nor any other evidence Plaintiff is aware of.

256.    Olohan never reported to anyone at Google Miller's alleged inappropriate statements regarding his purported affinity for Asian women. [Olohan Dep. at 223:4 – 225:19; Stewart Dep. at 228:15 – 24 (stating he had no knowledge of any of the allegations Ryan made about Tiffany until the lawsuit); Schiestel Dep. at 146:19 – 25; Menon Dep. at 74:25 – 78:5; Alvarez Dep. at 85:10 – 86:4.]

**Response**: Denied, as Olohan told Menon, a member of Google's Human Resources, that he was groped by Miller at Fig & Olive and that she made inappropriate comments, which were continuing. Olohan Dep. 196:15 – 198:4; 200:22 – 202:5; Menon Dep. 77:13-19. Schiestel and Stewart were aware

that Miller regularly made inappropriate comments. Olohan Dep. 223:4-15.

257.   Olohan described Miller's alleged comments regarding his purported affinity for Asian women and visiting the gym as "annoying," "minor" and "not a big deal." [Olohan Dep. at 242:16 – 23; 244:8 – 245:5.]

**Response**: Denied, as Olohan only testified that he considered Miller's comment about his being at the gym and working out to be minor (Olohan Dep. 242:20-22) and "not a big deal" (Olohan Dep. 244:10-11) and, with regard to Miller's comments about his preference for Asian women, testified that "put it altogether, it's like, more of a deal, where it's like I'm sensitive towards the Asian thing. It, like, bothers me. There are certain things I would be more sensitive about, so those are the things that hit home more." Olohan Dep. 244:12-17. Olohan further testified that he was offended by Miller's comments about his preference for Asian women. Olohan Dep. 185:13-20.

258.   Assuming for purposes of this motion that Miller made inappropriate comments to Olohan at the karaoke event in April 2022, Olohan conceded that he stayed at the event and continued to do karaoke. [Olohan Dep. at 249:9 – 14.]

**Response**: Admit.

259.   According to Olohan, Miller publicly disagreed with him at a dinner in late 2021 at Vestry, stating in sum or substance, "I disagree with you about 70 percent of the time." [Olohan Dep. 226:17 – 229:8.]

**Response**: Admit.

<em>Other Complaints</em>

260.   Olohan was aware that he could make an internal complaint at Google by: reporting the concern to his HR contact; reporting the complaint anonymously; or reporting the concern to his manager, Stewart, or another senior leader. [Olohan Dep. at 110:2 – 22.]

**Response**: Admit.

261.    In 2021 after he purportedly raised concerns about Miller to Menon in HR, Plaintiff raised a concern to HR regarding alleged non-inclusive behavior by a male senior executive who Olohan described as "extremely outspoken on social media about politics, religion, and other subjects." [Tomezsko Decl. ¶ 40, Exh. 39 at GOOG-OLOHAN-00003848; Olohan Dep. at 141:4 – 143:25.]

**Response**: Admit.

262.    HR escalated Olohan's concern to ER for investigation. [Tomezsko Decl. ¶ 40, Exh. 39 at GOOG-OLOHAN-00003847.]

**Response**: Admit.

263.    Olohan testified that within one or two months of his complaint, Google addressed the concern by removing the complained-of social media post. [Olohan Dep. at 141:4 – 143:25.]

**Response**: Admit.

264.    In 2017, ER investigator Keeley Weir (now Hynes) conducted an investigation into concerns raised about ██████████ [Alvarez Decl. ¶ 16, Exh. 4 at GOOG-OLOHAN-00003152 – GOOG-OLOHAN-00003160.]

**Response**: Admit.

265.    Weir concluded that █████ interfered with an ongoing investigation by making comments in reference to the complainant's meeting with ER, which were intended to discourage the complainant from raising certain concerns to ER's attention. [Alvarez Decl. ¶ 16, Exh. 4 at GOOG-OLOHAN-00003159 – GOOG-OLOHAN-00003160.]

**Response**: Admit.

266.    █████ employment was terminated as a result of ER's findings. [Alvarez Decl. ¶ 17.]

**Response**: Admit.

267.   According to Google's records, █████ identifies as a Hispanic woman. [Schiestel Decl. ¶ 34.]

**Response**: Admit.

268.   In 2022, Alvarez investigated complaints raised against ███████ [Alvarez Decl. ¶ 18.]

**Response**: Admit.

269.   According to Google's records, █████ is a white man. [Schiestel Decl. ¶ 35.]

**Response**: Admit.

270.   Alvarez concluded that █████ violated the Anti-Discrimination Policy (specifically, the Obligations of a manager section) and the Alcohol Policy by: (a) asking his direct reports about an ongoing ER review, which fell short of the expectations of a manager to foster an environment where Google employees feel safe to raise concerns or participate in a review; (b) failing to set clear expectations as it relates to alcohol consumption during a team event and making the team aware that excessive drinking is not appropriate; (c) failing to maintain awareness at a team event he hosted which facilitated an environment where inappropriate conduct was not addressed creating a perception he knowingly ignored inappropriate behavior. [Alvarez Decl. ¶ 18, Exh. 5 at GOOG-OLOHAN-00001956 – GOOG-OLOHAN-00001957.]

**Response**: Admit.

271.   As a result of Alvarez's findings, she recommended (and █████ received) a Written Warning. [Alvarez Decl. ¶ 18, Exh. 5 at GOOG-OLOHAN-00001956 – GOOG-OLOHAN-00001957.]

**Response**: Admit.

272.   According to Google's records, █████ identifies as an Asian man. [Schiestel Decl. ¶ 33.]

**Response**: Admit.



273.   ███████████ identifies as a white male. [Tomezsko Decl. ¶ 41, Exh. 40 ("████████ Dep.") at 60:9 – 10.]

**Response**: Admit.

274.   ███████████████████████████████████████████████████
██████████████████. [████████ Dep. 71:5 – 9.]

**Response**: Admit.

275.   ██████████ testified that ██████████████████████████████
███████████████████████████████████████████████ [████████
Dep. 60:11 – 17.]

**Response**: Denied, as ████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████ Dep. 60:11-17.

276.   Olohan testified that he believes his termination is "convenient" because he is a white male, and that "everyone in a position of power" had the opportunity to prevent his termination; because they did not, they allegedly discriminated against him on the basis of his gender. [Olohan Dep. 97:16 – 98:5, 100:2 – 101:12.]

**Response**: Denied, as Olohan only testified that it was "[c]onvenient to replace [him] with someone other than a white male" (Olohan Dep. 98:4-5) and that those "involved in the decision to terminate" discriminated against him (Olohan Dep. 101:4-8).

### PLAINTIFF'S COUNTER-STATEMENT OF MATERIAL FACTS

### Olohan Excels in His Role at Google

277.   Stewart hired Olohan onto his team because of his "strong reputation of driving sales growth, high revenue growth, and building strong high-functioning teams." Olohan Dep. 34:17 – 35:5.

278.    Olohan was a high-performing sales leader who received performance ratings of "Exceeds Expectations," "Strongly Exceeds Expectations," or "Superb" in virtually every performance cycle since 2007. Rissmiller Decl. Ex. P; Stewart Dep. 24:24 – 25:2; 26:12 – 27:4.

279.    Olohan never received a negative performance rating at Google. Schiestel Dep. 21:20-23.

280.    Olohan inspired his team and was good with clients. Schiestel Dep. 26:3-9.

281.    Olohan's People Partner, Jacky Schiestel, supported Olohan's application for a promotion to a vice president position in April 2022, writing that "Ryan is a very strong sales leader, knows how to motivate sellers. It is his superpower. Ryan is a huge asset to LCS." Schiestel Dep. 26:20-22; 27:8-12.

282.    Olohan received six promotions at Google, culminating in his position as Managing Director - Food, Beverage & Restaurants in 2019. Olohan Decl. ¶ 3.

283.    Olohan managed a team of approximately 65 people. Olohan Dep. 35:19-22.

284.    Google awarded Olohan with the "Great Manager Honorable Mention Award" and "Impact Award." Olohan Decl. ¶ 4.

285.    Olohan received Google's "Foundation" award for excellence every year from 2016 through the end of his employment, which included a minimum $250,000 yearly incremental equity grant. Rissmiller Decl. Ex. S (GOOG-OLOHAN-00000033); Olohan Decl. ¶ 4; Stewart Dep. 32:4-7.

286.    The Foundation awards Olohan received were in recognition of his "exemplary leadership, expertise, and impact," which were "critical to Google's success …" Rissmiller Decl. Ex. S (GOOG-OLOHAN-00000033).

287.    Olohan was also recognized as an external thought leader and was named a "Top 40 Healthcare Transformer" in 2016 and "Top 50 Healthcare Influencer" in 2017 and 2018. Olohan Decl. ¶ 5.

**Miller Gropes Olohan at December 2019 Fig & Olive Dinner**

288.    On December 3, 2019, Adam Stewart hosted a dinner at Fig & Olive at 420 West 13th Street, New York, New York 10014 for the approximately 15 Google employees on his team, including Olohan and Miller. Rissmiller Decl. Ex. O (GOOG-OLOHAN-00003950); Olohan Dep. at 152:3 – 153:10; Miller Dep. 178:8-10.

289.    At the dinner, Miller told Olohan and another director, Alex Angeledes, that they were "studs," or another compliment to that effect. Angeledes Dep. 10:14-21; 40:10-14; 42:18-24.

290.    At the dinner, Miller rubbed Olohan's stomach from top to bottom with her fingers and told him he had "nice abs." Olohan Dep. 165:23 – 166:6; 166:19-22; 168:3-10; Angeledes Dep. 40:21 – 42:2; 43:1-5; 57:14-18.

291.    Miller's rubbing Olohan's stomach with her fingers made him uncomfortable, and he considered it to be a major infraction. Olohan Dep. 168:19-23; 174:20-23; 370:25 – 371:10.

292.    Olohan was offended by Miller's complimenting his abs and thought it was a line that should not have been crossed. Olohan Dep. 174:20 – 175:19.

293.    Angeledes, who witnessed Miller's comments about Olohan's appearance and abs at Fig & Olive, testified that they were not appropriate for a work event and were not out of character for Miller. Angeledes Dep. 44:23 – 45:1; 45:16-20; 64:10-13.

294.    Miller also complimented Angeledes' appearance, which he found inappropriate. Angeledes Dep. 45:3-9; 46:6-17.

295.    Miller would commonly be intoxicated at Google events and was clearly intoxicated at Fig & Olive. Olohan Dep. 176:11-24; 177:14-20; Angeledes Dep. 39:6-8; 39:15 – 40:7; Kenyon Dep. 134:24 – 135:7.

296.    Miller admitted to having at least two glasses of wine at Fig & Olive. Miller Dep.

181:8-21; 185:7-9.

297.    Miller admitted to consuming at least three alcoholic beverages at multiple Google events in and out of the office. Miller Dep. 49:18-23; 52:17-19; 106:2-13; Rissmiller Decl. Ex. K (GOOG-OLOHAN-00003930).

298.    Miller kept alcohol in her personal office. Miller Dep. 50:7-9; 52:10-12.

299.    Miller drank alcohol during the workday. Miller Dep. 63:8-11; 75:10-12; Rissmiller Decl. Ex. J (GOOG-OLOHAN-00003967).

300.    Drinking during work hours is a violation of Google policy. Stewart Dep. 213:15-19; Schiestel Dep. 106:15-21.

301.    In May 2020, Miller wrote to a coworker: "Over sharing here...3rd day in a row not drinking... like it's some amazing accomplishment.." Rissmiller Decl. Ex. I (GOOG-OLOHAN-00003962).

302.    Miller was known by the nickname "Tiff After Dark" at Google. Miller Dep. 89:21-23; 90:20-21; 92:23 – 93:8; Stewart Dep. 211:11-19.

303.    The nickname referred to her "playfulness" in social settings and could in part be attributed to her drinking. ███████ Dep. 30:3-14; 31:23 – 32:4; 32:22 – 33.

304.    Miller's coworker referenced "keeping 'Tiff After Dark' in line." Rissmiller Decl. Ex. H (GOOG-OLOHAN-00003986).

305.    Olohan was uncomfortable addressing Miller's conduct at Fig & Olive at the time because many of the Google employees present, including his supervisor, Stewart, had been drinking alcohol excessively. Olohan Decl. ¶ 9; ███████ Dep. 37:6-11.

306.    Stewart could not recall whether he had more or less than seven alcoholic drinks at Fig & Olive. Stewart Dep. 215:24 – 216:2l.

307.    Later that night, when Olohan suggested to coworkers that Miller may have had too much to drink, he was informed that her behavior was "Tiffany just being Tiffany." Olohan Decl. ¶ 10.

308.    At the time of the dinner, Olohan had been part of the team for approximately three weeks. Olohan Decl. ¶ 7.

**Google Ignores Olohan's Complaints and Miller's Continued Harassment**

309.    When Olohan had issues with his team members, he ran them by Schiestel and Menon. Olohan Dep. 47:5-19.

310.    During December 2019, Menon met with Olohan one-on-one at least biweekly. Menon Dep. 72:14-19.

311.    Within weeks of the Fig & Olive dinner, Olohan told Menon, a member of Google's Human Resources, that he was groped by Miller at Fig & Olive and that she made inappropriate comments, which were continuing. Olohan Dep. 196:15 – 198:4; 200:22 – 202:5; Menon Dep. 77:13-19.

312.    Menon admitted that if the situation was "in reverse," a female reporting harassment by a White male, it would be quickly escalated. Olohan Dep. 199:8-15; Olohan Decl. ¶ 12.

313.    Menon also admitted to Olohan that Miller drinks too much alcohol. Olohan Decl. ¶ 12.

314.    Menon was Olohan's people partner, a role that encompassed escalating sexual harassment complaints she became aware of. Menon Dep. 19:5-21; 20:2-12.

315.    Olohan also told Schiestel that Miller groped him at Fig & Olive dinner and complimented his abs. Olohan Dep. 205:22 – 206:16; 207:6-12; 214:16 – 215:15; 225:10-14; Schiestel Dep. 127:25 – 128:25.

316.    No one at Google ever interviewed Olohan or spoke to him further regarding his complaints. Olohan Decl. ¶ 13.

317.    While Olohan was still employed at Google, Olohan told a third-party witness outside of work about Miller "pushing herself on him," touching him, and making comments about knowing he liked Asians, his muscles, and the spice of one of their marriages. Marucci Dep. 32:4 – 34:12; 39:8-17; 101:22 – 102:10.

318.    On two occasions, Olohan told that third-party witness that he reported Miller's actions to Google. Marucci Dep. 38:9-14; 40:14-18.

319.    Olohan expressed disbelief to that third-party witness that Google was not handling his complaint properly. Marucci Dep. 40:24 – 41:17; 42:14-18.

320.    Miller regularly made comments to Olohan about Asian women, such as "we know you love Asian women." Olohan Dep. 170:2-9; 247:2-6.

321.    Miller referenced Olohan liking Asian women on five to ten separate occasions. Olohan Dep. 239:12-18.

322.    Schiestel and Stewart were aware that Miller regularly made inappropriate comments. Olohan Dep. 223:4-15.

323.    Olohan was offended by Miller's comments about his preference for Asian women. Olohan Dep. 185:13-20.

324.    Olohan testified that Miller discriminated against him on the basis of his gender and race. Olohan Dep. 98:17-24; 131:19 – 132:5.

325.    Miller also complimented Olohan's clothing, told him that he was handsome, and that her marriage lacked "spice." Olohan Decl. ¶ 15; Miller Dep. 167:17-20.

326.    Miller is an Asian woman. Miller Decl. ¶ 2.

327.    Miller was aware that Olohan's wife is an Asian woman. Miller Dep. 166:21 – 167:13.

328.    Following Olohan's rejection of Miller's sexual advances and report of the incident to

Human Resources, Miller began accusing Olohan of microaggressions, which Schiestel admitted to Olohan were instances of Miller being petty. Olohan Dep. 217:21 – 218:10; 221:16-20; Olohan Decl. ¶ 16.

329.    In both instances, Human Resources and other Google managers were present during the interactions between Olohan and Miller that formed the basis of Miller's complaints of alleged "microaggressions." Olohan Decl. ¶ 17.

330.    At a December 2021 offsite dinner, Miller loudly berated Olohan, in front of the other Google employees present, that she only agreed with him a certain percentage of the time. Olohan Decl. ¶ 19; Miller Dep. 204:8-20.

331.    Miller's comment made it uncomfortable for everyone sitting at the table. Schiestel Dep. 108:5-14.

332.    Schiestel admitted that Miller's comments were inappropriate and that the incident was severe enough to require several meetings and a formal apology. Schiestel Dep. 110:10-15; 113:19-24.

333.    Miller's testimony that no one suggested she move from her seat, and that she returned from the bathroom and sat in the same seat (Miller Dep. 207:25 – 208:6), was contradicted by Schiestel's testimony that Miller was moved to another part of the table after her comments (Schiestel Dep. 108:16-20).

334.    Stewart asked Miller to apologize because her comments were not appropriate. Stewart Dep. 200:15-20.

335.    Miller apologized to Olohan multiple times, including based on her alcohol consumption. Miller Dep. 208:20 – 209:11; Stewart Dep. 210:8-16; 210:25 – 211:3.

336.    Miller admitted to Olohan that she was drunk when she made the comments and that the comments were out of line. Miller Dep. 215:21 – 216:10; Olohan Dep. 228:4-16; 236:14-16.

337.   Miller testified that she had two glasses of wine at the dinner event, the minimum amount she claimed to have had at the 2019 Fig & Olive dinner. Miller Dep. 181:8-21; 185:7-9; 198:22-24.

338.   Schiestel did not document or escalate the dinner incident. Schiestel Dep. 112:16-25.

339.   Schiestel considers Miller a friend. Schiestel Dep. 98:14-19.

340.   Schiestel deemed complaints against Miller to be "interpersonal conflict[s]" or "coaching moment[s]," which did not require escalation or formal investigation. Schiestel Dep. 114:5-16; 143:2-15; Stewart Dep. 194:22 – 195:9.

341.   In or about April 2022, Stewart and the CG&E Management Team held an offsite event that ended with a party at a karaoke bar. Olohan Decl. ¶ 21.

342.   Miller mocked Olohan when he arrived late to the event and asked if he was at the gym again, building his muscles. Olohan Decl. ¶ 22.

343.   At the event, Miller told Olohan that she knew he preferred Asian women to White women. Olohan Decl. ¶ 23.

344.   At the event, Miller again became visibly intoxicated and berated Olohan in front of other Google employees. Olohan Decl. ¶ 23.

345.   As a result of Miller referring to herself as a Nazi at work, she was required to undergo coaching or training, which should be have been documented. Schiestel Dep. 121:2-21.

346.   Miller inappropriately referenced the racial identity of one of her reports during a leadership meeting, which was never documented. Schiestel Dep. 139:8 – 141:9; 142:11-19.

347.   Miller's retaliation against Olohan caused him increased anxiety that was well known by Human Resources. Olohan Decl. ¶ 24.

348.   Schiestel noted that she understood that Miller's continued hostility towards Olohan

made him feel like he was "on probation." Olohan Decl. ¶ 25.

**Miller's History of Harassing Other Google Employees**

349.    Miller supervised former Google employee Frances Kenyon during 2012 and 2013. Kenyon Aff. ¶¶ 2-3.

350.    Kenyon witnessed Miller inappropriately touching White male employees in the workplace and at out-of-work employee gatherings. Kenyon Aff. ¶ 5; Kenyon Dep. 108:9-22.

351.    Kenyon witnessed male employees become uncomfortable as a result of Miller touching them. Kenyon Dep. 109:9 – 110:9.

352.    At an employee dinner Miller held at her apartment in the summer of 2013, Kenyon witnessed Miller flirting with a White male subordinate approximately ten years younger than her and repeatedly rubbing his back. Kenyon Aff. ¶ 6; Miller Dep. 248:5-9.

353.    Miller shared a lounge chair with that employee, who she supervised, and while sitting with him leaned in to put her hand on his back in an intimate fashion two times for approximately 30 seconds each. Kenyon Dep. 119:19 – 120:17; 124:10-18; 180:23 – 181:16; 182:15-24; 184:2-7; 190:10-24.

354.    [Intentionally left blank]

355.    [Intentionally left blank]

356.    Miller discussed her unhappiness with her marriage with Google coworkers. Miller Dep. 162:4-12.

357.    At multiple employee gatherings at The Tippler, a bar below Google's Chelsea Market office, Kenyon again witnessed Miller flirting with White male employees and frequently touching their backs and shoulders during their conversations. Kenyon Aff. ¶ 8; Kenyon Dep. 88:4-9; Miller Dep. 256:21-23; 260:4-11.

358.    Miller leaned heavily on a white male client's forearm and put her hand on the client's hand, after which he got up and moved. The same night Miller put her arm around an employee's shoulder. Kenyon Dep. 111:11 – 113:7; 193:2-6; Miller Dep. 257:14-19.

359.    Miller's touching employees and clients was a distraction, awkward, unprofessional, and created an environment Kenyon was uncomfortable with. Kenyon Dep. 96:23 – 97:7.

360.    Miller's inappropriate behavior was widely known within Google, and approximately six of Kenyon's coworkers at Google described Miller's inappropriate behavior as "Tiffany being Tiffany." Kenyon Aff. ¶ 9; Kenyon Dep. 135:17-22.

361.    Multiple colleagues told Kenyon "everybody knows that's just Tiffany being Tiffany, don't report that, don't make a big deal about that" when there was too much drinking, offensive comments, or flirting. Kenyon Dep. 137:24 – 138:10.

362.    When Kenyon reported Miller to Google's Human Resources, Miller retaliated against Kenyon by making false claims to Human Resources about her and preventing her from transferring to another team at Google. Kenyon Aff. ¶ 10.

363.    Kenyon found the similarity between her experience working with Miller and Olohan's allegations to be "uncanny." Kenyon Dep. 95:4-23.

364.    Other Google employees who worked with Miller stated that the quotations Olohan attributed to Miller were "on brand" and "sound exactly like her." Rissmiller Decl. Ex. R.

365.    Miller supervised a Google employee named ███ Miller Dep. 261:15-21; Rissmiller Decl. Ex. L (GOOG-OLOHAN-00001179); Menon Dep. 23:3-5.

366.    In 2017, ██ complained to Google that Miller made him uncomfortable on several occasions. Rissmiller Decl. Ex. D (GOOG-OLOHAN-00005230); Menon Dep. 21:25 – 22:4; 23:14-18.

367.    Both Google human resources and employee relations were aware ███ complaints.

Menon Dep. 44:12-17.

368.    Google interviewed ▮ on November 30, 2018. Rissmiller Decl. Ex. L.

369.    ▮ told Google that "Over the course of three years, but when it comes to offsites there is that extra request or an extra advance" from Miller, including "subtle comments and suggestions." Rissmiller Decl. Ex. L (GOOG-OLOHAN-00001179-1181).

370.    After Miller invited ▮ for drinks, ▮ "was having inklings of her intentions." *Id.*

371.    Miller told ▮ "I could never be married to you that would be crazy." *Id.*

372.    Miller told ▮ that she was "going to stop all the fangirl stuff." *Id.*

373.    During Google offsite in Boulder, CO in August 2017, "[a]fter a dinner she linked arms [with ▮ for a whole city block. She wasn't letting go, [▮ was trying to distance [him]self that way." *Id.*

374.    Miller linking arms with ▮ made him uncomfortable. *Id.*

375.    Later that night, ▮ and Miller took an elevator alone together up to their separate rooms. *Id.*

376.    After exiting the elevator to go to their rooms on the same floor, between 10:00 – 10:30 pm, Miller asked ▮ to come to her room and watch a movie. *Id.*

377.    As a result, ▮ "[w]anted to get in [his] room as quickly as possible and lo[ck] [his] door." *Id.*

378.    ▮ "felt weird and funny, didn't want to make a scene and [wanted to] get out the situation as quickly as possible." *Id.*

379.    ▮ told Miller that he was tired, to which Miller responded "you are right that would not be appropriate." *Id.*

380.    Miller's actions were "impacting [▮] day to day job," which he described as "a

swirl," noting that he "cannot be [an] open book with her." *Id.*

381.   Miller acknowledged locking arms with ███████ walking across the offsite and could not recall when they broke physical contact. Miller Dep. 263:10-18; 264:19-25.

382.   Google never interviewed Miller about ███████ Miller Dep. 266:8-10.

383.   Google's only action to review ██████ complaints was the initial intake interview it conducted. Menon Dep. 26:15-21; 29:21 – 30:4

384.   Google never formally investigated ██████ complaints or took any additional steps beyond the initial interview and a follow-up with ████ Menon Dep. 32:25 – 33:5; 34:6-15.

385.   Google's 30(b)(6) designee was not aware why no investigation into the complaint was undertaken after the interview. Menon Dep. 29:6-12.

386.   Google never found that Miller violated any of its policies based on ██████ complaints until March 23, 2023, over four years after its interview of ████ Menon Dep. 31:13-19; Rissmiller Decl. Ex. N (GOOG-OLOHAN-00001184-1185).

387.   Miller faced no disciplinary action based on ██████ complaints until March 23, 2023, over four years after Google's interview of ████ Menon Dep. 34:17-25; Rissmiller Decl. Ex. N (GOOG-OLOHAN-00001184-1185).

388.   Google's 30(b)(6) designee acknowledged that inviting an opposite-sex coworker to their hotel room late at night to watch a movie is inappropriate. Menon Dep. 61:4-18.

389.   Google's 30(b)(6) designee was not aware why Miller faced no corrective action at the time of the complaints. Menon Dep. 37:23 – 38:2.

390.   Google's policies require it to address sexual harassment even when the harassed employee requests that no action be taken. Menon Dep. 41:18-23; Schiestel Dep. 115:21 – 116:14.

391.   Google's 30(b)(6) designee was the people partner assigned to ██████ case but could not

recall ever being aware of the nature of ████ complaints. Menon Dep. 43:18-20; 46:1-11.

392.   Within one week of speaking to ████ Google determined that no further action was needed. Menon Dep. 50:12-24.

393.   Google was aware that Ms. Miller's conduct was impacting Mr. ████ day-to-day job. Menon Dep. 62:10-17.

394.   Google closed the case file one month after it was opened with no disciplinary action required. Menon Dep. 46:18 – 47:7; 48:7-9.

395.   In March 2023, Google concluded ██████████████████████████ ██████████████████████████████ ██████████████████████████████ ████████████████ but only issued her a written warning. Rissmiller Decl. Ex. N (GOOG-OLOHAN-00001184-1185).

396.   The final written warning ██████████████████████ ██████████. Miller Dep. 285:21 – 286:5.

397.   While Google concluded that Miller ████████████████████ ████████████████████████████████ it only issued her a written warning. Rissmiller Decl. Ex. N (GOOG-OLOHAN-00001184-1185).

398.   The written warning ████████████████████████ ██████████████████████████████ ████████████████ *Id.*

399.   Miller instead received a "significant impact performance rating" following her written warning. Miller Dep. 291:13-24.

400.   Miller was not surprised to receive a rating higher than that specified by the written

warning. Miller Dep. 293:2-7.

401.    Miller did not know why Google waited over four years to assign discipline based on her interactions with ████████ Miller Dep. 295:8-15.

402.    Miller was not aware that ████████ raised any complaint until she received the final written warning doc and was never contacted about those complaints when they were raised. Miller Dep. 295:16-22.

403.    Another Google employee who worked for Miller experienced the same "themes of using HR for retaliation and of sexual harassment" Olohan raised in this action. Rissmiller Decl. Ex. M (GOOG-OLOHAN-00001182-1183).

404.    That Google employee raised a complaint about Miller but later withdrew it out of fear of retaliation after being told that it was "Tiffany being Tiffany," to "watch what I say in chat," and that "Tiffany has a reputation of retaliation and it is not worth risking my career over." Rissmiller Decl. Ex. M (GOOG-OLOHAN-00001182-1183).

405.    That Google employee witnessed Miller comment on photos of male Google employees and how attractive they were in multiple org-wide meetings. Rissmiller Decl. Ex. M (GOOG-OLOHAN-00001182-1183).

406.    That employee wrote that "the power imbalance of the victims of these comments vs. Tiffany would likely cause restraint in going to HR" and that there was a "sense throughout the organization that anyone who expressed concerns about the Tiffany or the way she managed or about any of her actions would be risking their career progression and future success at the company." Rissmiller Decl. Ex. M (GOOG-OLOHAN-00001182-1183).

407.    Miller told another director on the CG&E management team, ████████ that he was the most eligible bachelor in Google New York, which he found inappropriate. ████ Dep.

42:19 – 43:6; 43:23-25; Miller Dep. 296:14 – 297:6.

**Miller's History of Racial Comments at Google**

408.    Miller frequently made inappropriate racial comments in Kenyon's presence, including:

- "l got myself a White boy. White boys love Asian women."

- "White guys always want Asian women."

- "White girls, I can't stand them."

- "You White girls need to step it up. It's not my fault White guys like Asian women."

- Telling White male employees that they "need an Asian girl" and that they "just haven't had an Asian girl yet."

Kenyon Aff. ¶ 4; Kenyon Dep. 126:20-24.

409.    Miller joked with Kenyon and brought up race in conversation with her. Miller Dep. 238:7-10.

410.    Miller referred to herself as a Nazi at work. Miller Dep. 225:2-4.

411.    Miller made race-based comments to Kenyon three to four times a week including that Kenyon looked "so white," she could be a girl on a "WB show," and she was "white and preppy." Kenyon Dep. 53:13-20; 54:22 – 55:7.

412.    Kenyon considered Miller's comments to be "shocking." Kenyon Dep. 49:10-13.

413.    Kenyon reported to Google's human resources that Miller's mentions of her race were making her feel uncomfortable and was retaliated against by Miller and prevented from transferring to another team. Kenyon Dep. 55:21-25; 98:15 – 99:14; 101:13-18; 154:2-18; 159:19-25.

414.    Google did not produce any documentation of Kenyon's report concerning Miller, which would have been responsive to Olohan's discovery requests. Rissmiller Decl. ¶ 23.

**Stewart Informs Olohan That There Are "Too Many White Guys" on His Team and Terminates His Employment**

415.    Google's stated goal is for racially and gender-diverse teams and for its leadership to be representative of the broader population. Stewart Dep. 55:20 - 56:10; 57:5-17; Schiestel Dep. 73:21 – 74:3; 89:15-18.

416.    Google's goals for its senior management were 30% diversity in terms of gender and race, which is a metric individual leaders were held to. Schiestel Dep. 76:24 – 77:14; 94:16-22.

417.    Stewart's supervisor made sure that his team, including Stewart, understood Google's diversity goals. Stewart Dep. 62:2-8.

418.    Stewart was aligned with Google's diversity goals. Stewart Dep. 63:12-14; 71:25 – 72:4.

419.    Stewart "was really proud of the fact that we had a lot of female leaders at the manager level" and "felt that we were making good traction in like our aspirational goals." Schiestel Dep. 84:11-14.

420.    Stewart was "adamant in fact that directors on his team account for DEI in employment decisions." ███████ Dep. 50:19-23.

421.    Stewart "was very communicative about DEI with his leadership team" including during weekly meetings. Members of his team "were held accountable to certain DEI specific objectives and key results (OKRs) as they were called at Google" and "those were conversations that came up in performance reviews as well as in -- in just regular one on one conversations." ███████ Dep. 52:8-15.

422.    DEI guidelines were obligations for team leaders. ███████ Dep. 64:4-6.

423.    DEI initiatives and the diversity of director's teams impacted performance reviews. ███████ Dep. 53:24 – 54:7; Angeledes Dep. 17:16 – 18:11; 19:20 – 20:3.

424.    Inclusiveness in the context of DEI is part of performance evaluation, which can affect compensation. Stewart Dep. 47:7 – 48:17; 49:22 – 50:2.

425.    DEI initiatives were a priority for the CG&E leadership team. Miller Dep. 23:20-23.

426.    Diversity equity inclusion is a topic the CG&E leadership team covered regularly. Miller Dep. 26:19-20.

427.    Stewart and Schiestel reviewed Google's diversity data together yearly. Schiestel Dep. 83:25 – 84:5.

428.    CG&E leadership team tried to help career development for underrepresented Googlers. Miller Dep. 34:22-25.

429.    Human resources routinely performed audits to determine whether there was bias with respect to underrepresented employees when it came to performance reviews. ███████ Dep. 65:15 – 66:1.

430.    Between January 1, 2019, and August 31, 2022, 25 out of 31 Stewart's direct reports were Caucasian. Rissmiller Decl. Ex. Q; Schiestel Dep. 76:8-13; 78:9-24; Miller Dep. 32:19-22.

431.    Stewart said that his team was not representative of the broader marketplace. ███████ Dep. 57:7-9.

432.    Stewart told Schiestel that he did not "want to see any demographic dominate a team." Schiestel Dep. 85:20-25.

433.    Stewart and his boss were unhappy with the level of diversity at Google. ███████ Dep. 77:14-21.

434.    Stewart wanted a more diverse team. Stewart Dep. 72:6-9.

435.    Stewart wanted to ensure promotion ratings and promotion rates were at parity across race and gender lines. Menon Dep. 89:2-16; 99:16-21.

436.    Stewart discussed strategies with his team to improve representation. ███████ Dep. 76:19 – 77:13.

437.    In or about February 2022, Stewart informed Olohan that there were "obviously too many

white guys" on the CG&E management team. Olohan Decl. ¶ 26.

438.    Google's annual report on gender and racial breakdown was a constant reminder that the White male imbalance in higher levels had to be fixed. Olohan Dep. 104:11-21.

439.    In or about June 2022, both Schiestel and Stewart strongly encouraged Olohan to hire only female applicants for an open management position on his team.

440.    In or about July 2022, Stewart and Schiestel indicated that if the employment of one of Olohan's White male reports was not terminated and replaced with a female hire, Olohan's performance reviews, equity, and compensation would suffer. Olohan Dep. 125:23 – 126:20; 127:6 – 128:3; Olohan Decl. ¶ 27.

441.    Stewart decided to terminate Olohan's employment. Stewart Dep. 82:4-7.

442.    Olohan was replaced with a female employee. Olohan Dep. 98:6-9.

443.    Between 2020 and August 2022, four out of the five employees who left Google from Stewart's team were White males. Rissmiller Decl. Ex. Q.

444.    Stewart's directors were required to undergo "unconscious bias training" and "Directors were also asked to take on a specific personal OKR around what they were doing to further their own DEI education. And so those were written and -- written and shared with the rest of the director community within the Americas team. So you could see what your peers were working on their own DEI-related initiatives." ▮▮▮▮ Dep. 52:23 – 53:12.

445.    Google required Olohan to undergo training on white privilege and male privilege. Olohan Dep. 102:3-11; Olohan Decl. Ex. A (PL0258).

**Google Asserts Pretextual Policy Violations**

446.    Google purported to base the termination of Olohan's employment on employee relation's substantiation of four allegation:

- "**Allegation #1** Whether Ryan Olohan's actions as a leader created or facilitated an environment during an offsite event that lacked a sense of inclusivity in violation of Google's policy on Obligations of a Manager.

- **Allegation #2** Whether Ryan Olohan made inappropriate comments to direct reports during a dinner at the offsite event.

- **Allegation #3** Whether Ryan Olohan's actions as a leader created or facilitated an environment at an offsite event that encouraged or structurally facilitated excessive drinking in violation of Google's policy on Alcohol use, smoking and drugs.

- **Allegation #4** Whether Ryan Olohan was made aware of the ER review and actively sought to intervene or influence the ER review by seeking information from individuals who had been contacted by ER."

ECF No. 101-22 at GOOG-OLOHAN-00000266.

447.    On or about August 5, 2022, Google's Employee Investigations team, including Carlos Sousa and Cecilia Alvarez, held a videoconference call with Olohan and Stewart. Olohan Decl. ¶ 28.

448.    During that call, Olohan was informed that his employment had been terminated because he was not "inclusive." Olohan Decl. ¶ 29.

449.    In response to Olohan's request during the call for specifics as to why Google believed he was not inclusive, Google's Employee Investigations team explained that he had shown favoritism towards high performers, which it considered "non-inclusive," and commented on employees' walking pace and hustle, which it considered "ableist." Olohan Decl. ¶ 30; Stewart Dep. 104:25 – 105:3.

450.    Stewart testified that Olohan's favoritism played no role in the termination. Stewart Dep. 143:16-19.

451.    Stewart claimed that the statement "We like employees who hustle" is discriminatory.

Stewart Dep. 150:4-11.

452.    Olohan shared the "hustle" comment as precautionary tale. Alvarez Dep. 91:16-18.

453.    Stewart thought Olohan created a non-inclusive environment because the lodging decision for that offsite should have served as an immediate flag to Mr. Olohan when seeing that only men were staying at his house and others were not that there was a potential issue with regards to inclusion. Stewart Dep. 112:1-12.

454.    Four members of Olohan's team functioned as the planning committee for the offsite. Stewart Dep. 112:19-21; Alvarez Dep. Exhibit 10.

455.    The planning committee planned the lodging for the offsite. Giuliano Dep. 18:6-13.

456.    Offsite attendees were given the choice to stay either at Olohan's home or a nearby hotel. Stewart Dep. 138:9-16; Giuliano Dep. 16:9-14; 17:16-19.

457.    Olohan ran the offsite plans by Google's human resources on several occasions, including the sleeping arrangements. Olohan Dep. 283:8-11; 283:21-23; Rissmiller Decl. Ex. E (GOOG-OLOHAN-00004392).

458.    Olohan "asked his team what they wanted to do he didn't have anything to do with the planning there was a planning committee and it was run through the management team to some extent." Stewart Dep. Exhibit 6.

459.    Schiestel was aware of offsite plans in advance. Stewart Dep. 113:11-15.

460.    Schiestel is part of Google's human resources department. Stewart Dep. 114:7-9.

461.    Schiestel knew about offsite and lodging arrangements at least five days ahead of time. Schiestel Dep. 28:11-17; 32:12-18.

462.    Schiestel confirmed that the planning of the event was inclusive in advance of it happening and then was no longer concerned about the lodging arrangements. Schiestel Dep. 30:2-7;

34:13-16.

463.    Attendees had the option of where to stay; female attendees were fine with options but were "happier staying in a hotel with their own bathroom." Schiestel Dep. 33:11-19.

464.    Schiestel would have taken action in her HR role if lodging was not inclusive but did not because she did not think sleeping arrangements violated any policies. Schiestel Dep. 36:9-15; 37:5-8.

465.    ████████ the Google employee who raised inclusivity concerns regarding the offsite's lodging plans, was on the planning committee responsible for the offsite's lodging plans. Alvarez Dep. 109:19-21.

466.    Regarding a separate offsite event, Olohan wrote "I'm cool with an offsite but is there enough room so people have their personal space? Is there an option to stay somewhere else if someone is not comfortable sharing a house with coworkers? I'll run it by Jackie to confirm once we have the details." Stewart Dep. Exhibit 4.

467.    Stewart did not know when or if Mr. Olohan was aware of who would be staying at his house or what options he evaluated. Stewart Dep. 126:18 – 127:14.

468.    Stewart admitted that he was unsure if Olohan had anything to do with the planning of the offsite event. Stewart Dep. 181:6-14.

469.    Stewart suggested that Olohan should have moved the offsite location to a Google office but acknowledged he did not know if Olohan knew of which employees were staying where in advance. Stewart Dep. 127:1-14.

470.    Google acknowledged that any non-inclusivity on the part of Olohan was unintentional. Stewart Dep. 138:22 – 139:6; Alvarez Dep. 120:6-13.

471.    Stewart held Olohan responsible regardless of Olohan's knowledge or opportunity to

remedy the issue. Stewart Dep. 129:8-23.

472.   Whether Mr. Olohan had an opportunity to address the issue did not matter to Stewart's determination that Olohan was not inclusive. Stewart Dep. 130:20-24.

473.   Stewart and Schiestel told Olohan to keep the offsite agenda "light." Olohan Dep. 285:4-9.

474.   Stewart acknowledged that he was not sure whether Olohan gave proper alcohol guidance before the offsite. Stewart Dep. 131:11-24.

475.   Miller could not recall any specific instance where the event host sent any email relating to the alcohol policy. Miller Dep. 43:25 – 44:4.

476.   Stewart was not sure if he held offsite events that far surpassed the alcohol consumption at Olohan's offsite. Stewart Dep. 166:22 – 167:12.

477.   There were shots of alcohol served at two offsites Stewart hosted. Stewart Dep. 169:8-14.

478.   At one of those offsites, Stewart served a director-level employee, ███████████ shots of alcohol. ███████ became ill and vomited, and Schiestel held her hair. Olohan Dep. 279:5-8; 280:22 – 281:3.

479.   Two employees became visibly intoxicated at the offsite, one was unable to speak clearly and the other was having a hard time walking. Stewart Dep. 169:16-18; ███████ Dep. 36:6-21.

480.   Stewart was responsible for alcohol consumption at his offsites but faced no discipline. Stewart Dep. 170:15-25.

481.   The intoxicated employees were invited to the next offsite event despite her no longer being a member of Stewart's team. Stewart Dep. 171:2-6.

482.   Shots of alcohol are served at Google's holiday parties. Stewart Dep. 183:21-24.

483.    Employees sign the code of conduct at the beginning of employment and are responsible to know the alcohol policy. Schiestel Dep. 40:16-22; 42:20-22.

484.    Google would not discipline someone for failing to remind the team in advance of offsite about the alcohol policy. Schiestel Dep. 47:22 – 48:2.

485.    Attendees of CG&E leadership team events were not always warned in advance that they should not drink excessively because it's not a practice to remind before every event. Menon Dep. 85:12 – 86:17.

486.    Most Google events did not have an alcohol limit. ██████ Dep. 23:6-12.

487.    CG&E Team regularly drank at social events and had no limits on alcohol consumption. ██████ Dep. 24:5-12.

488.    Members of the CG&E team drank heavily at offsites. ██████ Dep. 24:25 – 25:3.

489.    There was always one or two CG&E members who drank too much at offsites. ██████ Dep. 25:10-25.

490.    [Intentionally left blank]

491.    [Intentionally left blank]

492.    ██████ drank around seven drinks at a single Google event. ██████ Dep. 40:2-8.

493.    The amount of alcohol served at Olohan's offsite was not excessive. Giuliano Dep. 15:22 – 16:1; Rissmiller Decl. Ex. F (GOOG-OLOHAN-00000628).

494.    Miller and ██████ were friends and ██ ██ reported to ██████ Olohan Dep. 300:9-21.

495.    Members of Olohan's team told him that Miller was behind the complaints that led to the termination and that she took great joy in hearing about it. Olohan Dep. 301:7 – 303:3; 305:18-25; 313:4-13.

496.   Stewart communicated with Miller on a weekly basis. Stewart Dep. 187:24 – 188:5.

497.   Miller had "channels to [A]dam [Stewart]," which she used to try to get Stewart "to not hire [Olohan]." Rissmiller Decl. Ex. G (GOOG-OLOHAN-00003964).

498.   On August 8, 2022, Alvarez wrote that "Olohan was terminated 8/5/22 as a result of allegations raised in Case 360 case #25645," referring to the case concerning the April 2022 offsite hosted by Olohan. Rissmiller Decl. Ex. T (GOOG-OLOHAN-00000254).

499.   On June 14, 2022, Olohan wrote to another employee: "I'm cool with an offsite but is there enough room so people have their personal space? Is there an option to stay somewhere else if someone is not comfortable sharing a house with coworkers? I'll run it by Jacky [Schiestel] to confirm once we have the details." Rissmiller Decl. Ex. E (GOOG-OLOHAN-00004391-4392).


Dated: June 10, 2024
        New York, New York

                                        **RISSMILLER PLLC**

                        By:     */s/ Alex Rissmiller*
                                Alex Rissmiller
                                5 Pennsylvania Plaza, 19th Floor
                                New York, NY 10001
                                T: (646) 664-1412
                                arissmiller@rissmiller.com

                                *Attorney for Plaintiff Ryan Olohan*